**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

---

**STACEY GOODALL-GAILLARD,**

        **Plaintiff,**

   **v.**

**NEW JERSEY DEP'T OF CORRECTIONS,**
**et al.,**

        **Defendants.**

Civ. No. 2:09-00954 (KM)(MAH)

**OPINION**

---

**MCNULTY, U.S.D.J.:**

    This matter comes before the Court upon motions for summary judgment brought on behalf of two separate groups of Defendants (Docket Nos. 148, 149). Because each group joins in the arguments of the other, I discuss the motions together.

    The factual allegations are highly involved. I have attempted to categorize Plaintiff's many allegations and place them in rough chronological order. (*See* Section I.B, pp. 4-32, *infra*.) Because it is difficult to assess their significance on first reading, I preview my legal analysis very briefly.

    The causes of action fall into two broad categories: Constitutional claims, and discrimination claims under Title VII and parallel state law. For threshold legal reasons, the Constitutional claims primarily implicate, not DOC, but the individual defendants in their individual capacities. Contrariwise, the statutory claims primarily implicate DOC, and not the individual defendants. The Constitutional claims against the individuals are dismissed primarily because they are legally infirm. Thus, for example, there is no viable First Amendment retaliation issue for trial, mostly because Plaintiff did not express herself on matters of public concern. There is no Fourth Amendment issue because an unwanted sexual advance is not a search or seizure. (*See* Section II.B, pp. 38-41, *infra*.) The statutory claims against DOC for Title VII retaliation and discrimination primarily fail because the claimed issues of fact either do not have evidentiary support or are not material to the particular cause of action against DOC, and hence do not survive the *McDonnell Douglas* burden-shifting

1

analysis. Thus, for example, Plaintiff's myriad filed grievances concerning routine workplace complaints, because they are not plausibly linked to gender or any other protected category, fail to support a Title VII retaliation claim. Many allegations are accompanied by accusations of gender bias, but there is insufficient specific evidence of discriminatory animus. (*See* Section II.C, pp. 47-55, *infra*.)

Finding that there is no genuine issue of material fact requiring trial, I enter summary judgment in favor of the Defendants.

## I.   BACKGROUND

The plaintiff, Stacey Goodall-Gaillard, brings this civil rights action against the New Jersey Department of Corrections ("DOC"), Commissioner George Hayman, Assistant Commissioner Lydell Sherrer, Assistant Administrator Eric Stokes, Chief Dean Yatauro, Chief Antonio Campos, Captain Richard Gilgallon, Lieutenant Wilfred Mungro, Lieutenant William Anderson, Sergeant Darron Daye, Luther Gregg, and Lance Byrd. *See* AC (Docket No. 17).

The Amended Complaint ("AC") alleges that Defendants unfairly targeted Plaintiff, a female Corrections Officer ("CO") at Northern State Prison, and subjected her to discriminatory treatment at her work place. *Id.* She alleges that this discrimination was based on her gender and her status as the recipient of seniority credit under a consent decree entered in *Holland v. N.J. Dep't. of Corrections,*. 246 F.3d 267 (3d Cir. 2001). AC ¶¶ 19-20.

The Amended Complaint contains eleven causes of action in all. Plaintiff alleges violations of the First, Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution (Counts 1-4); Title VII of the Civil Rights Act of 1964 (Count 5); 42 U.S.C. § 1981 (Count 6); and the New Jersey Law Against Discrimination ("LAD") (Count 7). She also alleges conspiracy to violate her constitutional rights (Count 8), as well as additional violations of 42 U.S.C. § 1983 under theories of deliberate indifference, selective enforcement, and *Monell* liability (Counts 9-11).

### A. Procedural History

On August 20, 2008, Plaintiff filed a Charge of Discrimination ("EEOC Charge") against the DOC with the Equal Employment Opportunity Commission ("EEOC"). The EEOC Charge alleged that she was subjected to a hostile work environment, and that she was discriminated against on the basis

of her gender in violation of Title VII of the Civil Rights Act of 1964. Defendants' Joint Statement of Material Fact ("DSMF") Ex. RR, EEOC Charge 8/22/2008. The EEOC issued a right-to-sue letter on December 8, 2008, but noted that its investigation did not confirm any statutory violations. DSMF Ex. DDD, EEOC Right to Sue Letter 12/4/2003. Plaintiff, acting *pro se,* filed a complaint in the United States District Court for the District of New Jersey on March 4, 2009. Complaint (Docket No. 1).[1] Plaintiff obtained counsel on September 10, 2009. (Docket No. 16). On September 23, 2009, with the benefit of counsel, she filed an Amended Complaint ("AC"). (Docket No. 17).

On October 22, 2009, Defendants Greg, Mungro, Anderson, Daye, Byrd, Hayman, Sherrer, Stokes, Yatauro, Campos, Gilgallon and DOC filed a motion to dismiss the Amended Complaint on the basis of the *Younger* and *Rooker-Feldman* abstention doctrines. (Docket No. 22). In an Opinion and Order dated March 15, 2010, Hon. Faith Hochberg, the District Judge then assigned to the case, denied the motion to dismiss. (Docket No. 37). Plaintiff moved to amend the Complaint a second time on February 17, 2011. (Docket No. 86). Then-Magistrate Judge Patty Schwartz[2] denied the motion to amend on March 24, 2011. (Docket No. 102).

The Defendants moved for summary judgment on May 31, 2011. (Docket Nos. 148, 149). After the motions were filed, the case was reassigned: first to Judge Claire C. Cecchi on June 30, 2011 (Docket No. 176), then temporarily to Judge Esther Salas on August 22, 2011 (Docket No. 211), and then back to Judge Cecchi on September 19, 2011. The summary judgment motions were administratively terminated by Judge Cecchi on November 6, 2011, to allow for settlement discussions. (Docket No. 215). On June 7, 2012, the Court referred the case to an appointed mediator. (Docket No. 222).

The case was reassigned to me on August 1, 2012. (Docket No. 225). Following an unsuccessful mediation, the summary judgment motions were reinstated on January 15, 2013. (Docket No. 230).

---

[1]    The original Complaint included additional Defendants not named in the Amended Complaint: Tanisha Holmes, Monica Miller, the Police Benevolent Association, Margaret Rock-Asencio, John Seburn, Allen Tompkins, John Chandar, and the Equal Employment Division. *See* Docket Nos. 1, 17.

[2]    Judge Shwartz now sits on the United States Court of Appeals for the Third Circuit.

### B. Factual Background[3]

The Amended Complaint alleges that the Defendants unlawfully discriminated against Plaintiff and violated her constitutional rights while she was employed by DOC. Defendants Hayman and Stokes are sued in their official capacities only. Defendants Sherrer, Yatauro, and Campos are sued in their official, individual, and supervisory capacities. AC ¶¶ 7-11. Plaintiff seeks compensatory damages of $250,000 for each cause of action, as well as punitive damages, attorneys' fees and costs, and any other relief the Court finds just and reasonable. AC at 12.

Plaintiff generally alleges that she was unfairly targeted by the Defendants because of her gender and her status as a beneficiary of the *Holland* consent decree. AC ¶¶ 19-21. Under the terms of that consent decree, she received eight years' retroactive seniority credit. She alleges that she was warned not to disclose that fact to protect herself against retaliation. *Id.* ¶ 20. For several years, alleges Plaintiff, she has been subjected to more severe punishment than male colleagues, and has been assigned menial jobs because she would not accede to the sexual demands of Defendants. *Id.* ¶ 22. She also alleges that less qualified recruits are given preferential treatment because they engage in improper relations with supervisors. *Id.* ¶ 23. Plaintiff alleges that she has been "forced out of work" on more than one occasion, deprived of her

---

[3]    The Parties' statements of facts and supporting exhibits are cited herein as follows:
   A. Defendants' Statement of Material Facts ("DSFM") (Docket No. 149-2)
        a. Ex. A-C (Docket No. 149-2)
        b. Ex. D-J (Docket No. 149-3)
        c. Ex. K-Z (Docket No.149-4)
        d. Ex. AA-NN (Docket No. 149-5)
        e. Ex. OO-UU (Docket No. 149-6)
        f. Ex. VV-MMM (Docket No. 149-7)
   B. Plaintiff's Responsive Statement of Material Facts ("RSMF") (Docket No. 180-2)
        a. Ex. 1-3 (Docket No. 193)
        b. Ex. 4-6 (Docket No. 194)
        c. Ex. 7-10 (Docket No. 195)
        d. Ex. 11-19 (Docket No. 184)
        e. Ex. 20-25 (Docket No. 185)
        f. Ex. 26-30 (Docket No. 186)
        g. Ex. 31-40 (Docket. No. 187)
        h. Ex. 41-44 (Docket No. 188)
        i. Ex. 45-48 (Docket No. 189)
        j. Ex. 49-56 (Docket No. 190)
        k. Ex. 57-65 (Docket No. 191)

privately-owned weapon, and subjected to an increased workload. *Id.* ¶ 24-25. Finally, Plaintiff alleges that when she complained about the misconduct, Defendants unfairly disciplined, harassed, and retaliated against her. *See id.* ¶ 26-24.

### 1. DOC policies and practices regarding discrimination and harassment

DOC policy prohibits employment discrimination or harassment based on race or sex/gender. It is a violation of that policy to treat an employee less favorably based on her membership in a protected category, or to use derogatory or demeaning references regarding the protected categories. Retaliation based on claims of discrimination under the policy is also prohibited.

The DOC policy provides in relevant part:

The State of New Jersey is committed to providing every State employee and prospective employee with a work environment free from discrimination or harassment. Under this policy, forms of employment discrimination or harassment based upon the following protected categories are prohibited and will not be tolerated; race, creed, color, national origin, nationality, ancestry, age, sex/gender, (including pregnancy), marital status, civil union status, domestic partnership status, familial status, religion, affectional or sexual orientation, gender identity or expression, atypical hereditary cellular or blood trait, genetic information, liability for service in the Armed Forces of the United States, disability. To achieve the goal of maintaining a work environment free from discrimination and harassment, the State of New Jersey strictly prohibits conduct that is described in this policy. . .

It is a violation of this policy to engage in any employment practice or procedure that treats an individual less favorably based upon any of the protected categories referred to in 14(a) above. This policy pertains to all employment practices such as recruitment, selection, hiring, training, promotion, transfer, assignment, layoff, return from layoff, termination, demotion, discipline, compensation, fringe benefits, working conditions and career development.

It is also a violation of this policy to use derogatory or demeaning references regarding a person's race, gender, age, religion, disability, affectional or sexual orientation, ethnic background, or any other protected category set forth in 1(a) above. A violation of this policy can occur even if there was no intent on the part of an individual to harass or demean another. . . (Exhibit J, p.2, Sec. IIIA)

Retaliation against any employee who alleges that she or he was the victim of discrimination/harassment, provides information in the course of an investigation into claims of discrimination/harassment in the workplace, or opposes a discriminatory practice, is prohibited by this policy.

DSMF Ex. J, Excerpts from DOC Policy Statement on Prohibiting Discrimination in the Workplace, p. 1, 2, 6, Sec. IIA, VII. DOC policies also define sexual harassment, set forth employee and supervisor responsibilities, and establish a complaint process. DSMF (Docket No. 149-9) ¶ 122 (citing Ex. JJ, Excerpts from DOC Policy Statement on Prohibiting Discrimination).

The DOC Employee Handbook provides that a person shall not be denied employment, examination, appointments, training, recruitment, promotion, retention, discipline or any other personnel action because of membership in a protected category, including race, color, and sex. DSMF ¶ 119; Ex. K, DOC Employee Handbook Excerpts at ii, 6-1. The Handbook also establishes grievance and disciplinary procedures. Grievance forms (form DPF-251) may be obtained from the Human Resources or union representative. *Id.* Employees submitting these forms are instructed to give a statement of the grievance and the corrective measure suggested. *Id.* Grievances are submitted to Human Resources for processing and for arrangement of a multi-step hearing. *Id.* The first-step decision is provided to the grievant in writing, and may either resolve the grievance or provide for further appeal to step two. *Id.* Disciplinary procedures and appeal rights are also described in detail in the Handbook. *Id.*; Ex. K, DOC Employee Handbook at 6-1, 6-2.

Internal complaints of discrimination are submitted to the Office of Equal Employment Opportunity and are governed by New Jersey State Procedures for Internal Complaints Alleging Discrimination in the Workplace. DSMF ¶ 121 (citing Ex. L). The DOC's Equal Employment Division ("EED") receives and investigates DOC employees' discrimination, harassment, and retaliation complaints. *Id.* ¶ 214. Every DOC facility has a staff person who acts as an

administrative liaison to provide assistance to employees who file EED complaints. They hear employees' concerns and disseminate information about procedures for filing complaints. *Id.* ¶ 215.

An advisory form is issued to any Respondent accused in a retaliation proceeding before the EED. *Id.* ¶ 124. The advisory form states in relevant part:

> It is the policy of the Department that no employees shall be retaliated against for opposing policies or practices within the NJDOC that the employee believes to be discriminatory or retaliatory. Retaliation pertains to actions that occur because an individual has opposed discriminatory employment policies or acts; filed a discrimination complaint; or testified, assisted or participated in an investigation, proceeding or hearing involving employment discrimination. All staff are hereby directed to refrain from making any statement, taking action or participating in activities that may be perceived as retaliatory. You need to know that even when no probable cause if found to substantiate initial allegations of harassment or discrimination, any subsequent allegations of retaliation against the complainant or witnesses are investigated separately and independently. It is possible for a Respondent to be disciplined for an act of retaliation although the original complaint did not result in a finding of discrimination or harassment. Do not make yourself vulnerable to such a charge of retaliation. Conduct yourself in a professional manner that reflects your understanding of the Department's mission to eradicate all forms of discrimination and harassment in the workplace.

*Id.* (citing Ex. LL, EED Advisory).

The DOC has also implemented mandatory harassment and discrimination training for employees. Training sessions have been conducted at each facility by an EED representative. DSMF ¶ 216 (citing Ex. CCC, Sherrer Dep. at 19).

## 2. Plaintiff's employment history at Northern State Prison

The plaintiff, Stacey Goodall-Gaillard, was hired by the DOC in 1996. Pl. Responsive Statement of Material Facts ("RSMF") (Docket No. 180-2) ¶ 52. She asserts that she was hired as a result of the *Holland* Consent Decree. *Id.* ¶¶

7

318-19.[4] That consent decree resolved a number of lawsuits against the DOC for gender and race discrimination. The decree included a requirement that the DOC put in place education and training programs and set up the Equal Employment Division ("EED"). *Id.* ¶ 322. In addition, certain protected beneficiaries were granted seniority.

Plaintiff's first job for the DOC was at Wagner Correctional Facility. She asserts that she had problems with other staff members and supervisors when they learned she was a beneficiary of the consent decree. RSMF ¶¶ 324-25. In 1998, she transferred to Northern State Prison. *Id.* ¶ 326. As a result of the consent decree, after one year of service she was granted seniority credit for the equivalent of eight years of service. *Id.* 323. She alleges that colleagues at Northern State Prison were also upset to learn that she was a beneficiary of the consent decree. *Id.* ¶¶ 327, 329.

Plaintiff asserts that she had a positive work history at Northern State Prison. RSMF ¶ 312. Defendants' depositions, too, contained positive comments about Plaintiff's job performance. Defendant Sherrer testified that Plaintiff was conscientious and assertive. RSMF Ex. 6, Sherrer Dep. at 27-28. Defendant Gilgallon similarly testified that she was an "excellent officer" and that he had not had a problem with her prior to an incident regarding prison mail policy.[5] RSMF Ex. 2, Gilgallon Dep. at 66. Plaintiff asserts that her disciplinary record consists of retaliatory, "bogus charges." RSMF ¶ 312.

While at Northern State Prison, Plaintiff asserts, she was subjected to sexual harassment by other corrections officers, including sexual advances by Defendants Daye, Byrd, and Mungro. RSMF ¶ 330. She alleges that she was exposed to sexual harassment and violence by other corrections officers in the prison. *Id.* ¶¶ 331, 335. These experiences allegedly created a hostile environment which forced her out of work for "stress leave" from April 30, 2005 to June 2005. *Id.* ¶ 336.[6] Defendants assert that Plaintiff took sick leave to avoid an investigation into certain actions, which they do not specify. DRRSMF ¶ 346. Plaintiff alleges that when she returned to work, the harassment

[4]    Defendants assert the consent decree has no relevance in this case. Defendants Reply to Plaintiff's Responsive Statement of Material Fact ("DRRSMF") (Docket No. 210) ¶ 318.

[5]    That incident is described in further detail below.

[6]    This leave is discussed in further detail below.

continued. RSMF ¶ 338. In October of 2005, she was "banned" from the prison in retaliation for exercising her first amendment rights. She asserts that she received no pay during this time and was forced by DOC to see a psychiatrist. *Id.* ¶ 338. When she returned, she was subjected to continued harassment. *Id.* ¶ 340.

Plaintiff, personally and through an expert, asserts that she suffers from Post-Traumatic Stress Disorder and Major Depression as a result of the "repeated sexual harassment and discrimination" that occurred at Northern State Prison and within the DOC. RSMF ¶ 392 (citing Ex. 47, Thailer Expert Report). Defendants dispute the reliability of the expert report and deny that it supports Plaintiff's claims of gender discrimination. DRRSMF ¶ 394.

### 3. Individual Defendants

Plaintiff's lawsuit names the DOC and the following individual Defendants: George Hayman, Lydell Sherrer, Eric Stokes, Dean Yatauro, Antonio Campos, Richard Gilgallon, Wilfred Mungro, William Anderson, Darron Daye, Lance Byrd, and Luther Gregg.

Defendant Richard Gilgallon was stationed at Northern State Prison ("NSP") from 1987 to February 1, 2007. DSMF ¶ 17 (citing Ex. B, Gilgallon Dep. (Docket No. 149-2) at 10). During the relevant time, Gilgallon was a lieutenant and captain on the CO staff (promoted in 2003 or 2004), and retired from the DOC on February 1, 2007. DSMF ¶¶ 18-19 (citing Ex. B, Gilgallon Dep. at 10-11). Plaintiff claims that Gilgallon anonymously posted on prison blogs and made discriminatory comments about female officers. RSMF ¶¶ 229-30. Plaintiff also alleges that he arranged to bring "bogus charges" against her and conspired with others to have Plaintiff disciplined. *Id.* ¶ 228. She alleges that Gilgallon was partially responsible for her being replaced at her post by CO recruits. RSMF ¶ 341.

Defendant Darron Daye worked at Northern State Prison from 1994 to 1997, and from 1999 forward. He went to the Stabilization Reintegration Program boot camp ("SRP") at some point before 1999. DSMF ¶ 69 (citing Ex. H, Daye Dep. at 14). Daye testified that he did not recall directly supervising Plaintiff but Plaintiff disputes this. *Id.* ¶ 75 (citing Ex. H, Daye Dep. at 40); RSMF ¶ 75. Plaintiff alleges that Daye faced EED complaints for harassment. RSMF ¶ 369. She also alleges that he made a sexually explicit remark to her. RSMF ¶ 334. Daye denied Plaintiff's allegations of attempting to date her, using

foul or sexual language directed at her, or making comments about her weight. *Id.* ¶¶ 78, 82 (citing Ex. H, Daye Dep. at 47-49, 65).

Defendant Lance Byrd worked at Northern State Prison from 1988 to 2009, except for a one year period from 1994 to 1995 when he worked at East Jersey State prison. DSMF ¶ 49. Byrd was a senior CO from 1988 to 1994; a sergeant from 1994 to 2005; and a lieutenant starting in 2005. *Id.* ¶ 50. Defendant Byrd was not Plaintiff's direct supervisor and he testified that Plaintiff never worked for him. DSMF ¶ 58 (citing Ex. G., Byrd Dep. at 40); *see also* DSMF ¶ 52 (citing Ex. C, Pl. Dep. at 28). Plaintiff claims that Byrd singled her out and subjected her to inappropriate comments, and that he retaliated against her for filing a complaint against him. RSMF ¶¶ 241-42. Plaintiff further asserts that Byrd has been cited in at least thirteen EED complaints involving claims of sexual harassment or discrimination. RSMF ¶ 244 (citing Ex. 13, Byrd EED Complaints[7]).

Defendant Wilfred Mungro worked at Northern State Prison from 1987 to 2009, with the exception of a nine-month stint at East Jersey State Prison in 2003. DSMF ¶ 84 (citing Ex. I, Mungro Dep. at 9-10). Mungro was involved in a serious automobile accident in 2007, and he worked only sporadically from 2007 until he retired in May 2009. *Id.* ¶ 85. (citing Ex. I, Mungro Dep. at 58-60).

Defendant Luther Gregg was the vice president of the Police Benevolent Association. DSMF ¶ 107. Plaintiff asserts that Gregg, like her, was a party to and beneficiary of the *Holland* consent decree. *Id.* ¶ 108 (citing Ex. D, Pl. Dep. at 132). Gregg, as a PBA representative, represented Plaintiff on a number of occasions. He represented Plaintiff in Disciplinary Appeals resulting in dismissal of an unauthorized absence charge and multiple lateness charges on June 5, 2007. *Id.* ¶¶ 111, 112 (citing Ex. S, Disciplinary Appeal Hrg. 6/5/2007; Ex. T, Disciplinary Appeal Hrg. 6/5/2007). He also represented her in a successful Disciplinary Appeal on April 16, 2008 for neglect of duty. *Id.* ¶ 110 (citing Ex. R, Disciplinary Appeal Hrg. 4/16/2008). Plaintiff does not assert that Gregg harassed her, but she states that he did not adequately respond to her problems. DSMF ¶ 109 (citing Ex. D, Pl. Dep. at 138). Plaintiff asserts that Gregg "turned his head" while things happened to her, and that he failed in his duty to tell the persons involved that their actions were wrong and illegal. RSMF ¶ 271.

---

[7]     This exhibit is missing from Plaintiff's submission. *See* Docket No. 184.

Lieutenant Anderson was a Sergeant at Northern State Prison. Plaintiff asserts that Defendant Anderson was a good friend of Defendant Daye. DSMF ¶ 113 (citing Ex. D, Pl. Dep. at 52). She also asserts that he was a Mason (an apparent reference to the Freemasons, a fraternal organization). *Id.* ¶ 115 (citing Ex. D, Pl. Dep. at 61). Plaintiff alleges that Anderson liked her, flirted with her, and invited her to his house. *Id.* ¶¶ 116-117 (citing Ex. C, Pl. Dep. at 73, 143).

Defendant Campos worked at Northern State Prison as a Captain until May 10, 2008. DSMF ¶ 162. Plaintiff claims that Campos contributed to her being removed from her post, allegedly for failing to complete her duties, after she requested assistance and filed a complaint against two other supervising officers. RSMF ¶ 295. Defendants assert that Plaintiff does not provide any factual support for her claims against Campos. *Id.* ¶ 175.

Defendant Dean Yatauro was stationed at Northern State Prison from 1990 to 2008, except for a reassignment to Trenton State Prison for seven months in 1995. Yatauro started at Northern State Prison as a sergeant, and was promoted to lieutenant while at Trenton in 1995. DSMF ¶¶ 137-38. He was promoted to Captain in or about 2000, and then to Chief in 2005. *Id.* ¶ 137. (citing Ex. TT, Yatauro Dep. at 11-12). Yatauro left Northern State Prison in 2008 when he was transferred to Riverfront Prison. *Id.* ¶ 139 (citing Ex. TT, Yatauro Dep. at 14). Plaintiff generally alleges that Yatauro retaliated against her for refusing sexual advances from male supervisors, and because she is a *Holland* beneficiary. DSMF Ex. C, Pl. Dep. at 36; DSMF ¶ 140. Plaintiff does not allege that Yatauro made any sexual advances towards her. However, Plaintiff claims that Yatauro removed Plaintiff from her post at the prison because she was a *Holland* consent decree beneficiary and she was "not a willing participant in the sexual escapades that goes on at Northern State." *Id.*; DSMF ¶ 141 (citing Ex. C, Pl. Dep. at 36).

Defendant Stokes began working for the DOC in 2000 and became the Assistant Superintendent in 2004. *Id.* ¶ 176 (citing Ex. BBB, Stokes Dep. at 15-16). Stokes was not named in any of the EED complaints filed by Plaintiff. *Id.* ¶ 183. Plaintiff's claims against Stokes appear to arise from her belief that he failed to address her claims against the other Defendants when he was a Hearing Officer presiding over grievance and disciplinary proceedings.

Defendant Sherrer began working for Northern State Prison as assistant superintendent in 1991. He served as prison administrator from 2002 to 2007. *Id.* ¶ 188 (citing Ex. CCC, Sherrer Dep. at 9, 11). Plaintiff asserts that as

11

administrator, Sherrer was responsible for the prison: he directed the custody supervisory staff, who in turn directed the custody staff, including officers and recruits. RSMP ¶ 307. Therefore, Sherrer "played a role" in Plaintiff's discipline and reassignment. *Id.* ¶ 308.

Defendant George Hayman was the Commissioner of the DOC. Plaintiff has not made any specific allegations against Commissioner George Hayman. At her deposition, she testified that he "did not do anything to me personally" and that she named him as a Defendant because he was the Commissioner of the DOC. DSMF ¶ 220 (citing Ex. D, Pl. Dep. at 120).

### 4. Defendants' level of knowledge of the *Holland* consent decree and membership in the Masons

Plaintiff asserts that there was a culture of gender discrimination, harassment, and retaliation at Northern State prison, evidenced by disparate treatment of female officers and websites frequented by male DOC employees that targeted female officers. Plaintiff alleges that retaliation against her stemmed from the *Holland* consent decree and also arose from widespread membership in the Masonic fraternity.

#### a. *Knowledge of Holland consent decree*

Plaintiff alleges that she was retaliated against because, *inter alia*, she was a beneficiary of the *Holland* Consent Decree. Ex. D, Pl. Dep. at 137-38. The Defendants have professed various levels of familiarity with that consent decree.

Gilgallon stated at his deposition that he had "no particular feelings" about officers that were beneficiaries, and that he had benefitted similarly. DSMF ¶ 42 (citing Ex. B, Gilgallon Dep. at 42-43). He testified that he did know that Plaintiff was a beneficiary. *Id.* ¶ 43.

Mungro testified at his deposition that he was familiar with the *Holland* consent decree. RSMF Ex. 8, Mungro Dep. at 33-35. He stated that it addressed race and discrimination issues within the DOC, and that the DOC adopted stricter EEOC regulations and provided training as a result. *Id.* at 35. Mungro also testified that he was "constantly" accused of sexual harassment at Northern State Prison. *Id.* He recalled EED complaints from Plaintiff and two women who he said were her friends. *Id.*

Defendant Daye testified at his deposition that he was not familiar with the *Holland* consent order and that it had no influence on his interactions with Plaintiff. DSMF ¶ 55. Plaintiff disputes this. RSMF ¶ 55. Sherrer testified that he did not know that Plaintiff was a beneficiary of the *Holland* consent decree. *Id.* ¶ 202 (citing Ex. CCC, Sherrer Dep. at 28). Defendant Byrd also testified that he knew little about the *Holland* consent decree, other than that it led to discrimination training. *Id.* ¶ 55. Byrd did not recall any sexual harassment or discrimination complaints against himself. *Id.* ¶ 59 (citing Ex. G, Byrd Dep. at 39); *see also* RSMF ¶ 59 (Plaintiff disputing).

### b. Knowledge of Freemasonry at Northern State Prison

Plaintiff also asserts that she was harassed and retaliated against by a clique of men at Northern State Prison who were members of the Masons. According to Plaintiff, if a female officer was not dating one of the members, "she had problems." DSMF ¶ 37. Defendants assert that Plaintiff has not presented any evidence substantiating that theory. *Id.* (citing Ex. D., Pl. Dep. Excerpts 5/24/2010, at 57). The Defendants professed differing levels of familiarity with Freemasonry at Northern State Prison.

Defendants Mungro and Daye acknowledged that they were members of the Masons. Daye, who was a member from 2007, described it as a benevolent society. *Id.* ¶ 74 (citing Ex. H, Daye Dep. at 32-33). He stated—and Plaintiff disputes—that he did not know if any other corrections officers or supervisory staff were members. *Id.*; RSMF ¶ 74. Mungro was a member of the Prince Hall Masons,[8] which he described as a "brotherhood" and an "uplifter of their community." DSMF Ex. I, Mungro Dep. at 28-29. Plaintiff asserts that Campos, too, was a member of the Masons. DSMF ¶ 162.

Byrd testified at his deposition that he was not a member of the Masons, did not know how many people at the prison were Masons, and was unaware of Masons' having received preferential treatment. *Id.* ¶ 56 (citing Ex. G, Byrd Dep. at 33-34).

Gilgallon testified that he had heard of the Masons and thought it was a secretive organization, but that he had never been a member. He stated that he never heard of a group called the Prince Hall Masons, and did not know

---

[8]     Prince Hall, an abolitionist leader, is considered to be the founder of African-American Freemasonry.  www.mwphglnj.org/history.php?mod=ph.

whether any male corrections officers were members of Masonic groups. *Id.* ¶ 45 (citing Ex. B, Gilgallon Dep. at 24-25).

Yatauro testified that he was not aware of corrections officers who were members of the Masons having received better treatment than female officers. *Id.* ¶ 145 (citing Ex. TT, Yatauro Dep. at 37-38). He also testified that he did not know of any gender discrimination complaints by female corrections officers at Northern State Prison. DSMF ¶ 144 (citing Ex. TT, Yatauro Dep. at 25).

### 5. Specific Allegations Against Defendants

Plaintiff asserts a multitude of factual allegations against the Defendants in support of her discrimination and retaliation claims. I have attempted to categorize them and place them in chronological order where possible.

#### a. Metal Detector Search and Mail Sorting (2003)

Plaintiff alleges that she was unfairly searched by Byrd at an entrance metal detector in 2003, that she was assigned additional duties, and that she was singled out because of her gender and weight. Plaintiff filed an EED complaint regarding these issues and an investigation followed. DSMF ¶ 53 (citing Ex. II, Investigation Report 7/16/2003 at 2, 4, 6).

Regarding the unfair searches, Plaintiff reported to the investigator that when she arrived to work, Byrd would make her empty her pockets and handbag. Ex. II, Investigation Report 7/16/2003 at 2. She stated two possible reasons for Byrd's actions: her brother had recently been fired from the prison for bringing in a cellphone for an inmate to use, and Byrd had tried to date her. *Id.* Regarding the alleged discrimination based on her weight, Plaintiff stated that when Byrd found food in her coat pocket he made a comment about her eating on the job. *Id.* at 3.

Plaintiff's complaint also involved mail practices at the prison. Specifically, Plaintiff claimed that sorting the mail was an additional duty assigned to her from Byrd, who was not her supervisor. *Id.* at 2. At the time of Plaintiff's complaint, Byrd was the first shift sergeant in the mail room. Plaintiff was working in traffic control during the second shift. DSMF ¶ 61 (citing Ex. G, Byrd Dep. at 41). She alleged that Byrd directed inmate mail to her post, which was then to be redirected by Plaintiff to the inmates. *Id.*; DSMF ¶ 51 (citing Ex.

C, Pl. Dep. at 27-28). Plaintiff complained that she did not want the obligation of redirecting the mail. *Id.* ¶ 62.

Plaintiff also claimed that Defendant Sherrer attempted to talk her out of filing an EED complaint. DSMF Ex. EE, EED Decision 9/9/2003 at 2; RSMF ¶ 245. Sherrer denied discouraging Plaintiff from filing a complaint. *Id.* at 3. He also stated that Plaintiff never told him that she was being harassed or subjected to discrimination. *Id.*

Daye and Byrd also disputed Plaintiff's account. Daye told the investigator that he was assigned to the lobby to oversee the metal detector machine, and was being trained by Byrd. *Id.* at 4. Plaintiff's jacket was searched because the machine detected contraband organic matter when the jacket passed through the machine. *Id.* A follow-up search yielded a packet of hot chocolate mix. *Id.* Byrd's account of the incident was similar. He stated that all staff members were inspected in the same manner. *Id.* Defendants generally assert, and Plaintiff disputes, that all staff members are screened in the same manner when the machine indicates a positive finding. DSMF ¶ 53; RSMF ¶ 53.

Byrd acknowledged during the investigation that he brought about a change to the mail routing policy, but not as a means of punishing Plaintiff. Ex. EE, EED Decision 9/9/2003 at 2. Inmate mail has to be searched before it is delivered to inmates. DSMF ¶ 62. Under the old policy, after the search, the mail was sent to the unit where the recipient inmate was thought to be located. If the inmate turned out to be at a different location, the mail would be returned to the mail room, searched again, and rerouted. *Id.* ¶ 62 (citing Byrd Dep. at 42-44). That was inefficient.

A new policy, seemingly proposed by Byrd, was officially adopted by the prison.[9] A Custody Standard Operating Procedure dated January 15, 2003 and March 15, 2003 stated that undeliverable inmate mail would now be collected and forwarded to Traffic Control. The Traffic Control officer would be responsible for locating the inmate and rerouting the mail to the correct housing unit for distribution. DSMF ¶ 65 (citing Ex. HH, Mail Relocation

---

[9]     Daye testified that the traffic control officer redirected mail in accordance with this policy. *Id.* ¶ 80 (citing Ex. H, Daye Dep. at 42-44). Daye also stated that an administrator or chief (and not someone at Daye's level) would be responsible for revising the mail policy. *Id.* ¶ 77. Plaintiff disputes that the policy was officially adopted, but the record confirms that it was. RSMF ¶¶ 63, 65; DSMF Ex. EE, EED Decision 9/9/2003 at 2-3.

Custody Standard Operating Procedure, No. 1048, 1/15/2003 and 3/15/2003).

An EED Decision dated September 9, 2003, concluded that Plaintiff had failed to substantiate a claim for retaliation or discrimination. DSMF Ex. EE, EED Decision 9/9/2003. The decision cited statements by both Daye and Byrd that Plaintiff was not singled out for the search, and that all employees were required to screen their belongings in the detector machine. *Id.* at 1-2. It also noted Byrd's denial that he ever tried to date Plaintiff, as well as Daye's statement that he never heard Byrd comment on Plaintiff's weight. *Id.*

The decision found that the mail policy was adopted as an official Custody Operating Procedure and applied equally to all designated officers. Ex. EE, EED Decision 9/9/2003 at 2. The decision stated that there was "nothing to suggest that Sgt. Byrd sought to enact a new policy to discriminate against [Plaintiff]." *Id.* The EED investigation found insufficient evidence to substantiate Plaintiff's claims of gender or weight based discrimination, or her claim of retaliation by Byrd. *Id.* at 3. The decision also rejected Plaintiff's contention that Sherrer had tried to prevent her from filing an EED complaint, finding that Sherrer's account was also supported by that of Defendant Gregg. *Id.* at 3.

### b. *Mail Sorting (2005)*

Plaintiff's mail-related complaints continued. A memorandum dated March 30, 2005, reasserted prison mail policies. The memo stated that all mail addressed to inmates must be delivered directly to the inmates, and that all mail addressed to inmates not assigned to the housing unit would be delivered to Traffic Control, where officers would attempt to locate the inmate. DSMF ¶ 64 (citing Ex. GG, Memorandum Regarding Mail 3/30/2005). Plaintiff made a group of complaints on April 18, 2005, regarding retaliation in connection with mail processing policies and other institutional policies. DSMF ¶ 128. The complaints targeted ten prison employees including Defendants Anderson, Daye, Mungro, Yatauro, and Gilgallon. DSMF Ex. O, EED Decision 5/10/2005.

Plaintiff alleged in one of those complaints that in April 2005, Sergeant Daye filed a complaint against Plaintiff for her failure to sort the mail. She claimed that Daye's complaint was based on information from Officer Wassig. RSMF ¶ 249. Plaintiff asserted that sorting the mail was not one of her duties. DSMF ¶ 67 (citing Ex. C and D, Pl. Dep. at 17-19, 49-50). Wassig complained that the mail was not sorted when he picked it up. *Id.* Plaintiff denied that

Wassig ever picked up the mail, and said that it was picked up by Officer Hill. She believed that Wassig falsified his report in retaliation of her status as a beneficiary of the *Holland* consent decree. DSMF Ex. C, Pl. Dep. at 17-19.

The mail issue temporarily took on aspects of a discrimination, as opposed to retaliation, claim. A May 10, 2005 EED Decision addressed complaints by Plaintiff of sexual orientation and gender discrimination. DSMF Ex. O, EED Decision 5/10/2005 at 1. That decision, however, recounted an interview with Plaintiff in which she acknowledged that her claim of affectional/sexual orientation discrimination had been made in error. *Id.* Plaintiff clarified to the EED investigator that she felt retaliated against, not because she was female, but because of her challenges to workplace policies, procedures, and work ethics. *Id. Id.* The EED, which does not have jurisdiction over general complaints about work assignments,[10] referred the matter to Defendant Sherrer for further review. *Id.*

Two months later, Plaintiff had a Minor Disciplinary Appeal Hearing regarding her refusal to comply with Daye's orders to sort and relocate the mail. DSMF Ex. FF, Minor Disciplinary Hrg. 7/21/2005. She was charged with insubordination for returning the mail unsorted. *Id.* at 1. According to the hearing decision, Plaintiff provided two defenses: she was "too busy and she was not supposed to sort mail." DSMF Ex. FF, Minor Disciplinary Hrg. 7/21/2005 at 3; DSMF ¶ 68; *see* RSMF ¶ 68. Defendant Stokes served as the Hearing Officer. His decision stated that the mail handling process included locating, relocating, redirecting, rerouting, redistributing, and forwarding the mail. Sorting, wrote Stokes, was properly part of that process. *Id.* Management had imposed a five day suspension, which Stokes reduced to one day. *Id.*

### c. Key Incident (2005)

Plaintiff sues Defendant Gilgallon based in part on his involvement in a 2005 dispute regarding Plaintiff's custody of the keys to Tower 5 at Northern State Prison. DSMF ¶ 26 (citing Ex. C, Pl. Dep. at 115-16). DOC Internal Management Procedure sets forth requirements for key security and replacement. These procedures prohibit leaving a security key in an unsecured area. DSMF ¶ 123. Plaintiff asserts that after her shift, she turned in the keys to Sergeant Sears. However, there was a dispute as to whether she turned the

---

[10]    The retaliation alleged by Plaintiff was related to prior policy complaints and therefore did not fall within the purview of the EED. On this basis, Defendants assert that these claims do not state an EED subject matter because they are not related to a protected category such as race and gender, or to a prior claim for discrimination.

keys in. New keys for the tower were made as a precaution. DSMF ¶ 47 (citing Ex. B, Gilgallon Dep. at 73-78).

The incident was the subject of a disciplinary proceeding against Plaintiff. *Id.* ¶¶ 26, 28. (citing Ex. C, Pl. Dep. at 115-116). She was charged with leaving the keys next to a copy machine in an area frequented by both non-custody staff and inmates. *Id.* ¶ 29; Ex. E., Disciplinary App. Proceeding 5/22/2006). At the hearing, Gilgallon made an opening statement presenting the charge and gave a summation of the evidence against Plaintiff. Ex. E, Disc. App. 5/22/2006 at 350, 352. Sergeant Sears testified at the hearing that he found the keys by the copy machine when he was making copies. *Id.* at 351. Lieutenant Tompkins testified at the hearing that he called Plaintiff at home after the keys went missing and that she told him she knew where the keys were and was coming into work to retrieve them. *Id.* Plaintiff denies that she said this. RSMF ¶ 31.

Gilgallon corroborated Sears' account. At his deposition, he testified that he received information that Sergeant Sears found the keys by a copier and that Plaintiff admitted to Lieutenant Tompkins that she left them there. *Id.* ¶ 47 (citing Ex. B, Gilgallon Dep. at 73-74, 77-78). Plaintiff denies telling Tompkins this. She asserts that her keys were on top of the reports she turned in to Sears. RSMF ¶ 234.

Plaintiff's defense at the hearing was that the prison violated procedure by failing to use chits to track the keys. *Id.* ¶ 33 (citing Ex. E, Disc. App. 5/22/2006 at 352); RSMF ¶ 236. Officer Chandar McDonald testified on her behalf, confirming that chits were not used. She also explained that the towers were equipped with weapons.[11] DSMF Ex. E, Disciplinary App. 5/22/2006 at 352. Sears testified that, although policy dictated the use of chits for all keys, they had generally not been used for tower keys. Ex. E, Disc. App. 5/22/2006 at 351.

Hearing Officer Jason Strapp concluded that Plaintiff left the keys unattended in an unsecured area frequented by inmates. *Id.* at 352-53. The charge was sustained and Plaintiff received a ten-day suspension. *Id.* at 353; DSMF ¶ 36. Strapp's decision does not cite that Plaintiff alleged, or that any defendant engaged in, discrimination or retaliation in connection with this incident.

---

[11]     Plaintiff now disagrees with that assertion. RSMF ¶ 34.

### d. Call for Assistance in Arcade (2005)

Plaintiff alleges that Defendant Daye failed to provide assistance to Plaintiff during an April 2005 incident on the arcade, an outside post at the prison. DSMF ¶ 80 (citing Ex. C, Pl. Dep., at 50-53). Plaintiff was on duty with Officers Wycau, Wassig, and Carol, Sergeant Irvin, and another unnamed officer. Irvin told Plaintiff to call for assistance when the officers were attempting to handcuff an inmate who was being confrontational. Plaintiff testified that she called twice but no one responded. *Id.* She blamed Daye for that failure to respond. *Id.* Plaintiff asserts that Daye had responsibility for monitoring situations and sending officers to assist as requested. RSMF ¶ 254. Defendants assert that there is no evidence that Daye was present to receive the call or that he heard the call. DSMF ¶ 80. Daye denied having any involvement in this incident. *Id.* ¶ 81 (citing Ex. H, Daye Dep. at 49).

### e. Staffing Center Control with Recruits (2006)

In December 2006 Plaintiff filed an EED complaint against Mungro for staffing Center Control with recruits. *Id.* ¶ 98 (citing Ex. I, Mungro Dep. at 49-50).[12] Mungro testified at his deposition that there was no policy prohibiting him from doing so, and that Plaintiff's complaint was focused on particular female recruits. *Id.* The relevant Internal Management Procedure stated, in part that "[h]igh Security posts will be staffed by qualified senior corrections officers. Corrections Officer Recruits will not be assigned to these posts." DSMF Ex. BB, Internal Management Procedure NSP.CUS.1005 11/20/2006. Center Control was one of the posts designated as High Security or High Risk. *Id.* The policy also stated, however, that recruits could permissibly be assigned to any senior post as an "extra officer to assist Senior Staff and/or for Training purposes." *Id.*

Plaintiff filed a grievance against Defendant Yatauro for the use of recruits at Center Control. That grievance was heard at a May 3, 2007 Grievance Hearing, with Defendant Stokes as Hearing Officer. DSMF Ex. CC, Grievance Hrg. 5/3/2007; DSMF ¶¶ 100, 142. At the hearing, prison management asserted that internal policy allowed recruits to assist as extra officers and for training purposes. *Id.* Management also stated that it was not practical to remove bidded officers from their posts to train them to work in the

---

[12]    The disposition of this EED complaint does not appear in the record before the Court. Based on the timing of the complaint, it is possible that it is covered by the February 1, 2007 EED decision discussed below. DSMF Ex. AA, EED Decision 2/1/2007.

Center. Management stated that it would look into training bidded officers, but reserved the right to continue training recruits for the post. *Id.*

Plaintiff alleged that this placement was against DOC policy and that it was done to "target" her. *Id.* (citing Ex. C, Pl. Dep. at 37). Plaintiff argues that the policy was changed to allow recruits to work in high risk posts after she filed a complaint. RSMF ¶ 257. The policy was adopted in November 2006 and revised in January 2007. DSMF Ex. BB, Internal Management Procedure NSP.CUS.1005 11/20/2006. After considering the grievance and Management's arguments, Defendant Stokes, acting as Hearing Officer, denied the grievance. DSMF Ex. CC, Grievance Hrg. 5/3/2007. The decision stated that the practice of using recruits was justified pursuant to the internal procedure. *Id.*

### f. *Sexual Harassment and Denial of Overtime (2006-2007)*

Also relating to the assignment of recruits to Center Control, Plaintiff filed a "third party sexual harassment" EED complaint around the end of 2006 or early 2007, claiming that Mungro flirted with other female officers and that it affected Plaintiff in her job. DSMF ¶ 90 (citing Ex. C, Pl. Dep. at 98-100). Defendants assert that this claim rests on "multiple hearsay evidence." DSMF ¶ 90. Plaintiff alleged that Mungro allowed young female recruits to "hang out" in Center Control. Plaintiff stated that Mungro had "fairly young corrections officer recruits handing around in center control for his personal enjoyment" and that he allowed the "female recruits to loiter in center control, looking at TV with him" and that he "even went so far as to cook food, buy cakes and other sweets and bring them on post for the sole purpose of luring these same females into center." DSMF ¶ 101; DSMF Ex. AA, EED Decision 2/1/2007 at 2; DSMF Ex. OO, Investigation Report 1/31/2007. Plaintiff claimed that CO Recruit Tanisha Holmes was Mungro's "favorite." DSMF Ex. OO, Investigation Report 1/31/2007. At her deposition, Plaintiff cited an incident where she asked Tanisha Holmes for assistance and Holmes declined, telling her later that Mungro said she did not have to help Plaintiff. DSMF Ex. C, Pl. Dep. at 100.

An Investigation Report from January 31, 2007, followed the EED complaint. The Report contained eight witness interviews and some written statements, including statements from recruits and senior officers. Ex. OO, Investigation Report 1/31/2007). Several witnesses reported conflict between Plaintiff and Holmes, and Senior CO Molly Richardson reported an argument between the two in late December 2006 regarding Holmes working in Center

Control. *Id.* at 7. The report cited evidence that recruits were allowed to be assigned to senior posts as extra officers to assist senior staff and/or for training purposes. *Id.* at 11. The witnesses' statements did not provide any evidence of sexually inappropriate behavior by Mungro. However, some witnesses reported that Plaintiff made inappropriate comments about Center Control, calling it a "whore house" and a "beauty contest" or "beauty pageant." *Id.* at 10, 11. The report also stated that Mungro had been listed in eight previous EED complaints, of which Plaintiff had filed four. *Id.*

After the EED complaint was filed, CO Recruits Holmes and Adina Byrd filed an EED complaint against Plaintiff, claiming that she made inappropriate comments about the prison not being "a whore house and a beauty pageant." DSMF Ex. OO, Investigation Report 1/31/2007 at 3, 11; DSMF Ex. C, Pl. Dep. at 103. Plaintiff alleges that the recruits' complaint resulted from a conspiracy between Mungro, Sergeant Miller, Holmes, and Adina Byrd. DSMF Ex. C, Pl. Dep. at 103 Plaintiff stated that after she was found guilty of the charge, Mungro gave the three women "buddy passes to go on vacation together."[13] *Id.*

The EED Decision dated February 1, 2007 addressed both the sexual harassment and overtime issues alleged against Mungro.[14] DSMF ¶¶ 101, 104; DSMF Ex. AA, EED Decision 2/1/2007. The decision stated that Plaintiff was unable to describe any inappropriate touching or comments by Mungro, or any connection to the race and age of the recruits. DSMF Ex. AA, EED Decision 2/1/2007 at 2. The decision concluded that the investigation had not corroborated Plaintiff's claims that the recruits, including Officer Holmes, were given preferential treatment or sexually harassed. *Id.* The decision also noted that recruits were working in the Center, but it was found to be for legitimate purposes and "due to a shortage of more senior volunteer officers." *Id.*

### g. Lineup Requirement (2007)

Plaintiff asserts that a CO lineup requirement for all shifts at Northern State Prison was discriminatory. *See* DSMF Ex. U, Internal Management Procedure NSP.CUS.0020. That procedure, effective as of August 2006, required that all shifts conduct a lineup of assigned staff for attendance roll call and the dissemination of safety and security information. *Id.* Under the

---

[13]   Plaintiff seemingly refers to some kind of airline passes, but this is not clear from the record.

[14]   Plaintiff's complaint regarding overtime is discussed separately below.

procedure, custody staff assigned to Center Control "may be granted exception by the Shift Commander" to the required line up of assigned staff on all shifts. *Id.*

Plaintiff alleged in a grievance dated February 13, 2007 that Gilgallon ordered the Center Control Officers to "stand line up." DSMF ¶ 38 (citing Ex. F, Grievance Form 2/13/2007). Plaintiff alleged that "this directive was to target me." *Id.* Gilgallon testified at his deposition that he was receiving complaints about officers, including Plaintiff and another officer, reporting late for their shifts at the Center Control. *Id.* ¶ 48 (citing Ex. B, Gilgallon Dep. at 82-84). This led to overtime claims from the officers who were being relieved. *Id.* That, say Defendants, was the reason for requiring that all Center Officers report for a lineup at the start time of each shift. *Id.* (citing Gilgallon Dep. at 82-84).

Plaintiff asserts that Gilgallon's requirement targeted only the second shift (and not the first and third shifts). RSMF ¶ 238. At the May 3 grievance hearing, Plaintiff asserted that the lineup requirement was the result of malice and retaliation by Gilgallon. DSMF ¶ 40. The grievance was denied on the basis of the policy, which left the decision as to who should or should not line up with the Shift Commander. *Id.* (citing Ex. V, Grievance Hearing 5/3/2007).

At a separate grievance hearing on May 22, 2007, Plaintiff asserted that she should not have received late slips for missing lineup because the policy and post orders gave conflicting information regarding proper procedure. DSMF Ex. W, Grievance Hrg. 5/22/2007. Plaintiff contended that some Center Control Officers were required to fill out late slips while others were not, and that Plaintiff was discriminated against because she had to stand lineup but Officer McDaniels (also a female officer) did not. *Id.*; DSMF ¶ 41 (asserting that grievance did not allege malice or retaliation). This grievance was denied. The decision stated that the issue of the lineup had previously been addressed and would not be revisited. *Id.* The decision directed Plaintiff and Officer McDaniel to clarify the situation with their Shift Commander. *Id.* The decision does not discuss any allegations or evidence of gender or race-based discrimination.

### h. Overtime (2007)

Plaintiff also made a complaint in January 2007 that Mungro harassed and retaliated against her by preventing her from working a double overtime shift in the tower. DSMF ¶ 102. Mungro testified at his deposition that it was against policy for an officer to work 16 hours in the tower. *Id.* (citing Mungro Dep. at 50-51). Plaintiff disputes that there was such a policy. RSMF ¶ 102. In

fact, she asserts that on the same date she was told that she could not work a double shift in the tower, three men were allowed to do so. RSMF ¶ 261 (citing Ex. 23, Special Report and Timesheet).

An investigation report addressing the complaint stated that assignment to the towers was a "long standing security concern for the NJDOC" because of past escape attempts. DSMF Ex. DD, Investigation Report 1/29/2007 at 1. As a result, the former prison commissioner, William H. Fauver, ordered that the officers in the towers would be rotated every four hours to retain optimum security and alertness. *Id.* Therefore, the report concluded, it would be "inconceivable" for an officer to work the same tower assignment on two consecutive shifts, and it appeared that Mungro made a "prudent decision" to assign Plaintiff to a different post. *Id.* at 2.

The February 1, 2007 EED Decision stated that the standing Post Order 13.02 made clear that Corrections Officers working extended hours of overtime beyond their regular shift would not be permitted to work in the towers "unless under emergent conditions and approved by the Shift Commander." DSMF Ex. AA, EED Decision 2/1/2007 at 2; DSMF ¶ 104.[15] The decision further noted that Plaintiff did not allege and the investigation did not disclose emergent conditions. Therefore the order was appropriate and there was no violation of policy. *Id.*

  i.  *Removal of Plaintiff From Post and Denial of Medical Attention (2007)*

Plaintiff alleges that she was pulled from her post on February 23, 2007, in retaliation for filing an unspecified EED complaint. DSMF ¶ 71 (citing Ex. C, Pl. Dep. at 114). Defendants contend that the reason she was pulled from her post related to a pending investigation into her altercation with Officer Tanisha Holmes. *Id.* ¶ 141.

Plaintiff denies that the Holmes altercation was the reason she was pulled from her post, but in any event blames Holmes for the incident. She asserts that she was in the lineup area on February 23, 2007 when Holmes walked in front of her and Plaintiff bumped into her. RSMF ¶ 278. According to Plaintiff, Holmes was upset because she had been scheduled to work in Center Control but Plaintiff was scheduled to work there in her place. *Id.* After the

---

[15]   Plaintiff disputes this point, but it is clear under the standing Post Order. RSMF ¶ 104.

altercation, Plaintiff immediately faxed a complaint to EED investigator Davis. DSMF Ex. C, Pl. Dep. at 138; DSMF Ex. MMM, EED Complaint 2/23/2007.

Plaintiff further alleges that Yatauro denied her medical attention on the date of the altercation. DSMF ¶ 146. After submitting the EED complaint, Plaintiff became ill and had an anxiety attack in the prison infirmary. She asked the infirmary to call 911. DSMF ¶ 147 (citing Ex. C., Pl. Dep. at 138-140). Sergeant Nutall, another DOC employee, allegedly told Plaintiff's husband (also a CO) that Officer Wilson said to put Plaintiff in a wheelchair and call 911 from the lobby. *Id.* Plaintiff testified at her deposition that she did not know which Defendant(s) denied her medical care because she was having an anxiety attack. *Id.* ¶ 148 (citing Ex. C., Pl. Dep. at 63-64). When pressed, she identified Defendants Sherrer, Yatauro, and "any administration that authorized the Center Keeper to make his actions." *Id.* Plaintiff alleges that Yatauro denied her care because he was in charge and did not intervene to make sure she received assistance. RSMF ¶ 278.

The evidence is undisputed that Plaintiff's exit on February 23, 2007, was health-related. Plaintiff did not return to work until April 24, 2007. Defendants state that Plaintiff was on leave during that period for an "undisclosed illness." DSMF ¶ 154. Prison records accord with Defendants' view that the absence was illness-related. The Office of Human Resources sent Plaintiff a letter on April 11, 2007 informing her that she had been absent from work since February 25, 2007 and that her absence was unauthorized. DRRSMF ¶ 282; DRRSMF Ex. A, HR Letter. The letter advised Plaintiff that if she returned to work she needed medical or other approved documentation authorizing a return to full duty status without restrictions. *Id.*

Plaintiff contests this characterization of her absence. She asserts that she was not at work between February and April because she was "banned" from the prison grounds. Plaintiff provides few details regarding this "ban." RSMF ¶¶ 282, 283. She asserts that she was removed by Yatauro at the direction of Sherrer on February 23, 2007, and "banned" from state grounds for an unknown period of time. *Id.* Plaintiff does not assert who told her she was banned from returning to work or whether she attempted or requested to return prior to April 2007. She offers no evidence, documentary or otherwise, supporting her assertion that any of the Defendants forced her to take a leave of absence or prevented her from returning to work.

When Plaintiff returned to the prison, she filed a grievance regarding her removal from post, and requesting to be returned to her bidded position at

Center Control. DSMF Ex. X, Grievance Hrg. 5/3/2007. The hearing occurred on May 3, 2007. Plaintiff stated that she was removed from her post on February 23, 2007 and subsequently left the prison because of illness. *Id.* A representative for the prison stated that a disciplinary investigation was not completed because Plaintiff had been out of work. *Id.* The decision found that Plaintiff was entitled to return to her post because there was no pending disciplinary hearing. Prison Management was ordered to return Plaintiff to her position. *Id.*

Plaintiff also alleges that her personal weapon was unlawfully seized the day of the February 23, 2007 incident. Before Plaintiff experienced her health emergency, she had checked in her off-duty weapon at the LCP-AD, a secure storage area. DSMF ¶¶ 153-54 (citing Ex. TT, Yatauro Dep. at 49). Defendants assert that LCP-AD was not used for long-term storage. When Plaintiff left the premises because of her illness, she did not return to retrieve her weapon, and so it was transferred to a suitable long-term storage location. *Id.* ¶¶ 154-55. Yatauro authorized the transfer and Sergeant Sloan wrote a corresponding report. DSMF ¶ 155. In response to Plaintiff's inquiry, Yatauro's office sent her a memorandum saying she could pick up her weapon at any time. DSMF Ex. UU, Memo to Pl. 4/30/2007.

Plaintiff disputes Defendants' account. She testified at her deposition that Sergeant Sloan stole the weapon. DSMF Ex. C, Pl. Dep. at 77. Although she admittedly was able to pick up the weapon at the armory two months later, she had no knowledge of how it got there. *Id.* Plaintiff filed a grievance requesting a written explanation as to why the weapon was taken and requesting a chain of custody report. DSMF Ex. SS, Grievance 3/12/2007; DSMF ¶ 154. Defendants assert that the grievance was found to have no merit, but the exhibit cited does not pertain to this incident. DSMF ¶ 156.

### j.  *Meeting with Defendant Sherrer (2007)*

Plaintiff alleges that at a meeting on March 8, 2007, during Plaintiff's leave of absence, Defendant Sherrer told Plaintiff that she filed too many grievances and suggested that she stop. DSMF ¶ 189; RSMF ¶ 300;[16] Compl. ¶ 30. Plaintiff also asserts that Sherrer told her that he could not help her if she

---

[16]     The transcript page cited by Plaintiff for this statement is not contained in the excerpt submitted to the Court. *See* RSMF Ex. 19, Sherrer Tr. The Transcript excerpt, which contains part of a transcript made from an audiotape of a conversation between Sherrer and Plaintiff, begins at p. 21.

went outside the prison for help. RSMF ¶ 300. No third-party witness was present, but Plaintiff did make an audio recording of the meeting. RSMF Ex. 3, Pl. Dep. at 57; DSMF ¶ 197.

Defendants assert that Sherrer did not condition any future help on Plaintiff's ceasing her complaints, DSMF ¶ 190, and generally dispute Plaintiff's version of Sherrer's comments. Sherrer testified that he did tell Plaintiff that she makes "so many complaints," many of which "turn out historically not to be validated." DSMF Ex. CCC, Sherrer Dep. at 62. He testified that he told Plaintiff that "all she's got to do is get back to her post and that no one was trying to pull her from her post." *Id.* He explained that he talked to Plaintiff in this way because he was "trying to encourage her" to return to work and not lose her assignment or shift time. *Id.*

Plaintiff also alleges that Sherrer propositioned and groped her in March 2007, and suggested that she would receive better treatment if she acceded to the Defendants' demands.[17] DSMF ¶ 192; AC ¶ 30. At her deposition, Plaintiff gave a somewhat less dramatic account. She stated that, at a meeting in March or April of 2007, Sherrer came around his office desk. "He pulled me up, and he grabbed me, and kept squeezing on me." RSMF Ex. 3, Pl. Dep. at 53.[18] Plaintiff also described this as a hug. *Id.* at 56. She said Sherrer caught her off guard, and she did not ask him to stop because she was shocked. *Id.* At his deposition, Sherrer did not recall embracing or hugging Plaintiff during their meeting. DSMF ¶ 195 (citing Ex. CCC, Sherrer Dep. a 62). Plaintiff did not make an internal report or complaint regarding this incident prior to this lawsuit being filed. RSMF Ex. 3, Pl. Dep. at 55.

Plaintiff clandestinely recorded the conversation with Sherrer. As Defendants point out, this recording was made without Sherrer's knowledge or consent and would likely not be admissible at trial. DRRSMF ¶ 388; *see Hornberger v. Am. Broadcasting Co.*, 799 A.2d 566, 592 (N.J. Sup. Ct. App. Div. 2002) (discussing reasonable expectation of privacy standard and noting that conversations that take place in enclosed, indoor rooms are generally

---

[17]   I assume that Plaintiff alleges that this incident occurred at the same March 8, 2007 meeting. Although Plaintiff's deposition testimony does not specify a date, she does indicate that this occurred while she was "banned" and that she taped the meeting. RSMF ¶ 302.

[18]   The Defendants' excerpt of the deposition does not include this page. *See* DSMF Ex. D, Pl. Dep.

protected). I nevertheless have reviewed the transcript. The transcript indicates that Sherrer told Plaintiff that he could not offer her assistance outside the internal prison system. RSMF Ex. 19, Sherrer Tr. at 33-34. Immediately afterward, Sherrer also stated, "I do want you to know if I can help you out, don't hesitate." *Id.* at 34. This statement was consistent with several similar remarks made earlier in the conversation. I do not see, and Plaintiff has not stated, that anything on the tape corroborates her claim that Sherrer made improper physical contact with her. Nor does the transcript reflect any statement by Sherrer that Plaintiff would receive better treatment if she submitted to his sexual demands.

### k. *Refusal of Assistance (2007-2008)*

Plaintiff claims that on October 30, 2007, she was denied assistance by Campos while working as a second shift Center Control Locator, and failed to complete her duties as a result. DSMF ¶ 163. Plaintiff alleges that men who worked this position on the first and second shifts were routinely given assistance when they requested it. *Id.* (citing Ex. D, Pl. Dep. at 162). On October 30, 2007, Plaintiff filed a Special Report against Lieutenant Rock-Asencio and Sergeant Durr (the Second Shift Keeper) for failure to provide her with assistance. DSMF Ex. VV, Special Report 10/30/2007. The report claimed that Plaintiff was forced to stay late to complete her work because otherwise she would be pulled from her post. *Id.* Plaintiff now asserts that the denial of assistance was related to gender and race. RSMF ¶ 291.

Several weeks later, Plaintiff was disciplined for failing to complete the duties of her post on November 13, 2007. DSMF ¶ 163. She was charged with negligence of duties for failing to complete a daily trip sheet. DSMF Ex. AAA, Minor Disciplinary Appeal Hrg. 4/16/2008. The charge stated that Plaintiff failed to provide a justification for this failure and did not report it to any supervisors. *Id.*; DSMF ¶ 165. Plaintiff was removed from her post on November 14, 2007 and suspended for five days for violating N.J.A.C. 4A:2-2.3(a)11 and HRB 84-15. *Id.* ¶¶ 163, 165. She appealed the suspension. DSMF Ex. AAA, Minor Disciplinary Appeal Hrg. 4/16/2008.

Following the suspension, on November 27, 2007, Plaintiff filed three grievances concerning the Locator position or Defendant Campos. First, Plaintiff claimed that she was denied assistance by Rock-Asencio and Campos "even though both were informed that there was an overload of Locator work." DSMF Ex. WW, Grievance #1 11/27/2007. She alleged that the first shift left behind unfinished work, which in effect forced her to work overtime or leave

27

the work unfinished. *Id.* Plaintiff sought to be returned to her second shift Locator post and to be "treated fairly like first and third shift locators." *Id.* Plaintiff's second grievance alleged that she was reassigned from her second shift locator position on November 14, 2007, "without just cause, proper notice or a legitimate explanation." DSMF Ex. XX, Grievance #2 11/27/2007. She alleged that the reassignment was for discipline and requested to be returned to her post. *Id.*

In a third grievance,[19] Plaintiff claimed that Rock-Ascencio, Sergeant Mintz and Defendant Campos were harassing her and retaliating against her because of the special report she filed on October 31, 2007. DSMF Ex. ZZ, Grievance #4 11/27/2007. Plaintiff claimed that the harassment and retaliation "got serious" after she filed the report, and that she and Senior CO McDaniels were harassed even more by Mintz, Rock-Ascencio, and Sergeant Durr. *Id.* Plaintiff claimed that Campos aided the harassment because he had the authority to remove her from her post. *Id.*; RSMF ¶ 293. She again requested to be immediately returned to her post. *Id.* Defendants assert that Plaintiff failed to provide any facts showing how Campos aided in the alleged harassment. DSMF ¶ 170.

In addition to these grievances, Plaintiff submitted two EED complaints in November 2007 and March 2008 alleging harassment and retaliation by Defendants Mungro, Yatauro, and Campos, and four other DOC employees. DSMF Ex. NN, Investigation Report 4/9/2008. She alleged that these individuals discriminated and retaliated against her by refusing to provide assistance at her Center Locator assignment. *Id.* at 1; DSMF ¶ 125. Plaintiff alleged that the first and second shift locators were given help with their work load but she was denied assistance, and that she was treated differently than her male co-workers.[20] *Id.* at 1. She indicated in her complaint that she

---

[19]   Plaintiff also filed a fourth "Grievance and Special Report" on November 27, 2007. She alleged a breach of security and endangerment to officers and inmates stemming from an inmate altercation that occurred on November 14 and November 15, 2007. DSMF ¶ 169 (citing Ex. YY, Grievance #3 11/27/2007). Plaintiff requested training for supervisors for future situations. She was not directly involved in the altercation. *Id.* Plaintiff asserts that a supervisor should have accompanied corrections officers when they transported the inmate to the hospital after the altercation. RSMF ¶ 292.

[20]   At her deposition, Plaintiff alleged that Officer Ballister, a Latino, received Locator assistance, as did certain female, Latina officers. She cited this as evidence

thought she was being harassed because she was a participant in the *Holland Consent Decree*. *Id.* at 2.

The EED Investigation Report documented Plaintiff's complaint and set forth thirteen witness accounts and statements from the respondents. *Id.*; DSMF ¶ 126. The witness statements largely agreed that the Center Locator position was a one-person assignment. *Id.* However, Senior CO Jerome Carrol reported that the Center Locator usually required assistance for giving out weapons and doing housing placements. *Id.* at 4. Lieutenant Thomas Perdue also reported that the Center Locator would require assistance when there were a lot of housing assignments. *Id.* at 6. Senior COs Valerie Johnson and Chandar McDaniels also indicated that assistance may sometimes be required. *Id.* at 8-9. The witnesses did not report being denied assistance themselves, and also said that they did not witness Plaintiff receiving disparate treatment.

A Minor Disciplinary Hearing was held before Defendant Eric Stokes (acting as Hearing Officer) on April 16, 2008, regarding the charge that Plaintiff neglected her duties. DSMF Ex. AAA, Minor Disciplinary Hrg. 4/16/2008. Management presented three witnesses and ten exhibits in support of the charges against Plaintiff. *Id.* at 2. Plaintiff produced one witness and two exhibits, including her October 30, 2007 Special Report claiming that she was denied assistance and that management was conspiring against her. *Id.* Plaintiff also produced a November 14, 2007 memorandum from Campos in which he called Plaintiff "capable" and "very efficient." *Id.* at 3. Stokes found in favor of Plaintiff. He concluded that although Plaintiff failed to complete her assigned duties, she was not neglectful. *Id.* at 4. The charge was dismissed. *Id.*

An EED decision followed soon afterward. That decision, dated April 28, 2008, found that Plaintiff's allegations of discrimination and retaliation were not substantiated. DSMF Ex. MM, EED Decision 4/28/2008 at 1. The decision stated: (1) there was no corroboration for Plaintiff's claim of gender discrimination; (2) none of the 20 individuals interviewed could provide any corroboration; (3) no connections were established between the alleged retaliation and a prior EED matter; (4) no support was found for Plaintiff's claim that she was denied work assistance because she was a protected class

---

that she was discriminated against based on her race and gender from January 2006 to February 2008. DSMF Ex. C, Pl. Dep. at 89. Ballister is not a defendant in this case.

member of the *Holland* consent decree; (5) no witness linked Plaintiff in any way to *Holland*; (6) most supervisors and other witnesses believed the Center Locator position was a one person job; and (6) witnesses stated that additional staffing was a problem because of availability. *Id.* at 1-2. In sum, no support was found for a claim of retaliation—for the *Holland* consent decree, for having participated in another EED matter, or otherwise. *Id.* at 2. However, the EED returned the matter to the prison administrator to determine whether assistance was required for the second shift Center Locator assignment. *Id.* at 3.

### l.  Discriminatory Allegations against Defendant Gilgallon

Plaintiff generally alleges that Gilgallon was falsifying documents or assisting others with falsifying documents to retaliate against her by filing "bogus" disciplinary charges. DSMF ¶ 22 (citing Ex. C, Pl. Dep. at 12, 15, 16); RSMF ¶ 228.

Plaintiff also alleges that Gilgallon did not like women because he posted negative things about women on websites named "Jails Are Us," "Prison Watch," and "Prison Page Watch." She states that Sergeant Chandar told her about the websites and that "somebody" told her about pseudonyms used on the websites. DSMF ¶ 23 (Citing Ex. C, Pl. Dep. at 19, 20); RSMF ¶ 230. Plaintiff also alleged that Gilgallon referred to her and a number of employees on a prison fairness committee as "the bitter bitch crew." DSMF Ex. C, Pl. Dep. at 87. Defendants dispute these assertions. Gilgallon testified at his deposition that he knew of the websites. When asked if he posted comments on them he replied, "No, not that I know of." DSMF Ex. B, Gilgallon Dep. at 85-86.

### m.  Other Allegations against Mungro

Plaintiff alleges that Defendant Mungro did not want her to work as the Center Control locator, and that he attempted to find other candidates with more seniority to outbid her for the position. DSMF ¶¶ 86, 88; RSMF 264. Plaintiff asserts that other officers were not able to outbid her because she had seniority from the *Holland* consent decree. RSMF ¶ 264. Mungro denied that he targeted Plaintiff at his deposition, stating that he encouraged certain other officers to bid because "they were good officers" but "not to keep anybody else from being there." DSMF Ex. I, Mungro Dep. at 54-55.

Plaintiff also alleged that at Mungro's behest, she was harassed in 2006 by Sergeant Rhonda Mount Castle-Thomas. DSMF Ex. C., Pl. Dep. at 106-107,

110. Plaintiff testified that Castle-Thomas denied her breaks. *Id.* Plaintiff also said that Castle-Thomas told her that Mungro told her to harass Plaintiff. *Id.* at 107. Plaintiff indicated that this was an example of the conspiracy against her. *Id.*

### n. *Defendant Anderson's Order*

Plaintiff alleged that Anderson ordered her to handle an inmate who had bloody hands and needed to go to the hospital. DSMF Ex. D, Pl. Dep. at 52. When she expressed concern, he told her to put on gloves. *Id.* She requested bleach to clean up the area and claimed that she had to wait two hours to receive bleach. *Id.* at 53. Plaintiff told Anderson she was going to write up the incident if she did not get the bleach. She testified that Anderson said "I don't be threatening him, whatever the case." *Id.* at 53.

### o. *Excess Work*

Plaintiff asserts that the Defendants Daye, Byrd, Mungro, and Sherrer gave her menial work assignments because she would not give in to their sexual demands. DSMF Ex. C, Pl. Dep. at 34-35. Plaintiff further asserts that Sherrer gave her more work than her female counterparts. DSMF ¶ 203 (citing Ex. D, Pl. Dep. at 161-62).[21] Plaintiff did not articulate what sexual demands were made. *Id.* ¶ 206. Defendants assert that Sherrer never directly supervised officers at Northern State Prison and would not have assigned work to Plaintiff. *Id.* ¶ 205 (citing Ex. CCC, Sherrer Dep. at 11).

### p. *Conspiracy Allegations*

Plaintiff made various allegations of conspiracy—both general and related to specific instances—during her depositions and in her summary judgment papers. Plaintiff alleges that Defendants Gilgallon, Yatauro, Campos, and Stokes, as well as other non-Defendant corrections officers conspired against her for the purpose of getting her disciplined and fired. DSMF ¶ 212 (citing Ex. C, Pl. Dep. at 59). She testified that this conspiracy was the result of the "blue wall" of silence, which she defined as "Don't ask, don't tell. Keep your mouth shut or something is going to happen to you. It means they stick together. One hand washes the other." *Id.* ¶¶ 212-213; Ex. C, Pl. Dep. at 57.

---

[21]    This page is also not included in the Defendants' excerpt.

Plaintiff also alleges that the conspiracy between the Defendants affected her ability to obtain relief through the EED system. Plaintiff specifically asserts that Stokes failed to investigate EED complaints and "routinely determined" that there was no merit for such cases. RSMF ¶ 299. No EED records regarding Defendant Stokes are set forth in the record.[22] However, he served as Hearing Officer for several other complaints at issue in this lawsuit. Plaintiff points to two incidents: a 2005 disciplinary appeal, and the 2005 tower keys incident. Stokes was a hearing officer in the matter of Plaintiff's Disciplinary Appeal hearing regarding the mail room. DSMF Ex. FF, Disciplinary Appeal Hrg., 7/21/2005. Stokes reduced the recommended discipline from a five day to a one day suspension. DSMF ¶ 180. Plaintiff thinks she should not have received any discipline, and asserts that Stokes retaliated against her. *Id.* ¶¶ 180-81. Plaintiff also alleges that in 2005 Stokes was part of a conspiracy with Defendant Gilgallon and two other officers regarding the tower keys incident. *Id.* ¶ 182 (citing Ex. C, Pl. Dep. at 117). However, Stokes was not the Hearing Officer assigned to that case; Jason Strapp signed the decision. DSMF Ex. E, Disciplinary App. 5/22/2006.

Plaintiff's conspiracy allegations are not limited to gender-based discrimination. Plaintiff also alleges that Defendants conspired against her as a second shift locator in Center Control. Plaintiff alleges that first shift locator officers conspired to leave extra work for her during her shift, during her entire tenure at the Locator position. DSMF ¶ 211 (citing Ex. C, Pl. Dep. at 49).

---

[22] Plaintiff alleges that at some point, Stokes worked as an EED investigator and in that capacity he failed to investigate EED complaints and routinely determined that there was no merit. RSMF ¶¶ 298-99. The record does not contain, however, any records of EED investigations related to the Plaintiff that were handled by Stokes. Stokes testified at his deposition that he had no knowledge regarding the EED complaints filed by Plaintiff. RSMF Ex. 41, Stokes Dep. at 41-43.

## II.    DISCUSSION

In response to Plaintiff's multitude of claims, the Defendants make a multitude of arguments in their motions for summary judgment.[23] *See* Docket Nos. 148-1, 149-8. Two briefs were filed on behalf of the Defendants: (1) on behalf of Defendants Anderson, Byrd, Daye, Gilgallon, Gregg, and Mungro, Def. Br.   A (Docket No. 148-1), and (2) on behalf of Defendants DOC, Campos, Hayman, Sherrer, Stokes, and Yatauro, Def. Br. B (Docket No. 149-8). Each set of Defendants joins in the legal arguments set forth by the other. Def. Br. A at 46; Def. Br. B at 2.

The counts in Plaintiff's Amended Complaint are grouped below by type of claim. Defendants' arguments are discussed as they apply to each claim or group of claims. I must state at the outset that the allegations are extraordinarily complex and wide-ranging, and they are not always clearly tied to the underlying proofs or to a particular cause of action. Many of the workplace grievances alleged do not directly implicate any issue of deprivation of a constitutional right or discrimination. Consequently, I have given particular prominence to the claims of retaliation—*i.e.,* that Defendants

---

[23]    In Def. Br. A, Defendants argue the following: (1) all Section 1981 and 1983 and New Jersey LAD claims are barred by the statute of limitations, Def. B. A (Docket No. 148-1) at 4, 7; (2) individual co-workers are not "employers" for LAD purposes, *id.* at 8; (3) sovereign immunity applies to the Section 1983 LAD, and CEPA claims, *id.* at 12, 15, 46; (4) retaliation claim cannot be brought under Section 1983, *id.* at 16; (4) Section1981 cannot be brought against state actors, *id.* at 16; and that (5) summary judgment should be granted for Defendants on the First Amendment, Title VII, LAD, Fourth Amendment, due process, equal protection, conspiracy, and state law civil rights, *id.* at 17, 20, 21, 39, 40, 42, 43, 45-46.

In Def. Br. B, Defendants argue the following: (1) the state and federal constitutional claims against the DOC and the individual defendants in their official capacities are barred by the Eleventh Amendment, Def. Br. B (Docket No. 149-8) at 6, 43; (2) all of Plaintiff's claims under Section 1983 are legally deficient, *id.* at 13; (3) the Section 1983 claims against Sherrer, Yatauro, and Campos for respondeat superior are not viable under either a respondeat superior theory or individual liability theory, *id.* at 10, 21; (4) municipal liability is inapplicable to the DOC, *id.* at 42; (5) Plaintiff's deliberate indifference claim against the DOC fails as a matter of law, *id.* at 46; (6) the DOC is entitled to "Safe Haven" immunity against vicarious liability for the conduct of its employees, *id.* at 23; (7) Plaintiff has no separately cognizable constitutional claim under Section 1981, *id.* at 34; (8) Plaintiff has not established a prima facie case for her Title VII discrimination, retaliation, conspiracy, and selective enforcement claims, *id.* at 28, 31, 35, 45; and (9) Plaintiff's state law claim for punitive damages is barred by the New Jersey Tort Claims Act, *id.* at 44.

allegedly *responded* to workplace complaints or applied workplace rules, irrespective of their subject matter, in a manner that discriminated against Plaintiff based on her gender, or otherwise violated federal law.

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248; *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other

34

facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

### B. Constitutional Claims Under Section 1983 (Counts 1, 2, 3, 4, 8, 10, 11)

For the reasons stated below (Section II.B.1-3), Plaintiff's Constitutional claims are analyzed as claims, not against DOC, but against the individual Defendants in their individual capacities (Section II.B.4). The Amended Complaint contains claims pursuant to the First Amendment (Count 1), Fourth Amendment (Count 2), Fifth Amendment (Count 3), and Fourteenth Amendment (Count 4), as well as separate claims for conspiracy to violate Plaintiff's constitutional rights (Count 8), deliberate indifference for failure to train (Count 9), selective enforcement (Count 10), and *Monell* liability (Count 11). Plaintiff's federal constitutional claims are asserted pursuant to 42 U.S.C. § 1983. Plaintiff also separately asserts a claim against Defendants under 42 U.S.C. § 1981.

For the reasons set forth below, none of Plaintiff's Constitutional claims survive the motion for summary judgment.

### 1. Sovereign immunity protects the DOC and the individuals sued in their official capacities

Plaintiff's constitutional claims against the DOC and the state officials in their official capacities are barred by the Eleventh Amendment and Section 1983. The Eleventh Amendment to the Constitution guarantees the states immunity from certain claims: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Despite the limited scope of its wording, the Eleventh Amendment has for over a century been held to incorporate a more general principle of sovereign immunity that bars citizens from bringing suits for damages against any state in federal court. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100-101 (1984); *Kelley v. Edison Twp.*, No. 03–4817, 2006 WL 1084217, at *6 (D.N.J. Apr. 25, 2006) (citing *Bennett v. City of Atl. City*, 288 F. Supp. 2d 675, 679 (D.N.J. 2003)); *see also Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996); *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974); *Hans v. Louisiana*, 134 U.S. 1 (1890).

Monetary claims for deprivations of civil liberties under 42 U.S.C. § 1983 are subject to that sovereign immunity bar. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 66 (1989). Section 1983 provides:

> Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983 (emphasis added). A state is not considered a "person" for purposes of Section 1983 because it is protected by sovereign immunity. *Will*, 491 U.S. at 67-70.

The protection of the Eleventh Amendment extends to arms of a state—including agencies, departments, and officials—when the state is the real party in interest. *See Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d. Cir. 2002). DOC operates under a Commissioner appointed by the Governor with the consent of the Senate, and enjoys minimal autonomy. Defendant DOC is therefore considered an "arm of the state" and partakes of the state's Eleventh Amendment immunity. *Grabow v. Southern State Corr. Facility*, 726 F. Supp. 537, 539 (D.N.J. 1989); *Simrin v. Corr. Med. Servs.*, Civ. No. 05-2223 (RBK), 2006 WL 469677 *2 (Feb. 24, 2006) (dismissing claims against NJ DOC pursuant to Eleventh Amendment and Section 1983); *Didiano*, 488 F. App'x at 638-39 (affirming grant of summary judgment on Section 1983 and NJCRA claims in favor of DOC and DOC official sued in official capacity). DOC stands in the shoes of New Jersey for sovereign immunity purposes, and Plaintiff's 1983 claims against DOC therefore fail as a matter of law.

That immunity principle also bars Section 1983 claims against state officers acting in their official capacities. Under *Will*, "a suit against a state official in his or her *official* capacity is not a suit against the official but rather is a suit against the official's office." 491 U.S. at 71 (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)); *Hafer v. Melo*, 502 U.S. 21, 25 (1991)). Such a suit is thus no different from a suit against the State itself. *Id.* (citing *Kentucky v. Graham*, 473 U.S. 159, 165-166 (1985)); *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690 (1978). None of the individual Defendants, sued in

their official capacities, are "persons" subject to suit under Section 1983. Defendants Hayman and Stokes are sued only in their official capacity. AC ¶¶ 7, 9. Therefore, the Section 1983 claims against Hayman and Stokes fail as a matter of law.

A claim for damages against a state official in his or her *individual* capacity is a different matter. In that individual capacity, he or she does not partake of the state's Eleventh Amendment sovereign immunity, and is a suable "person" within the meaning of Section 1983. *Hafer v. Melo*, 502 U.S. 21, 30-31, 112 S. Ct. 358, 116 L.Ed.2d 301 (1991) ("the Eleventh Amendment does not erect a barrier against suits to impose individual and personal liability on state officials under § 1983") (internal quotations omitted); *Smith v. New Jersey*, 908 F. Supp. 2d 560, 563 (D.N.J. 2012). An award of damages from an individual defendant, as opposed to the public treasury, is a "permissible remedy in some circumstances." *Scheuer v. Rhodes*, 416 U.S. 232, 238, 94 S. Ct. 1683 (1974). Accordingly, the Eleventh Amendment does not bar the claims for damages against the individual Defendants in their individual capacities.

## 2. Statute of limitations

Defendants argue that all civil rights claims pursuant to Section 1983 based on events that allegedly occurred before March 4, 2009, should be dismissed on statute of limitations grounds. Def. Br. A at 4. Section 1983 does not contain its own a statute of limitations, but the Court will generally apply the statute of limitations of the state where it sits. *Lake v. Arnold*, 232 F.3d 360, 368 (3d Cir. 2000); 42 U.S.C. § 1988. The state's general, residual statute of limitations for personal injury actions will apply, as will relevant state tolling rules, as long as they do not conflict with federal law and policy. *Id.* at 368-69 (citing *Wilson v. Garcia*, 471 U.S. 261, 276–80, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); *Hardin v. Straub*, 490 U.S. 536, 543–44, 109 S.Ct. 1998, 104 L.Ed.2d 582 (1989)). In New Jersey, the statutory limitations period is two years. N.J.S.A. 2A:14-2.

Federal equitable tolling principles may come into play when the state statute of limitations would "otherwise frustrate federal policy." *Lake*, 232 F.3d at 370. Here, Plaintiff alleges a pattern of harassment, discrimination, and retaliation by the Defendants that violated her constitutional rights. If Plaintiff has made out a constitutional claim, the statute of limitations for the alleged violations, which admittedly do extend into the two-year period preceding the filing of this action, would likely be tolled, at least as to DOC. As to claims against individual Defendants, such a pattern might be more difficult to

establish. Because I dispose of the claims on other grounds, I do not reach the statute of limitations issues.

### 3. Personal Involvement Requirement

Defendants correctly note that the Amended Complaint includes claims against Defendants Yatauro, Campos, Gilgallon, Mungro, Anderson, Daye, and Byrd in their supervisory capacities. Def. Br. B at 10; AC ¶¶ 10-16. The liability of a defendant in a Section 1983 civil rights action cannot be predicated on *respondeat superior*. *See Shaw by Strain v. Stackhouse*, 920 F.2d 1135, 1147 (3d Cir. 1990); *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018 (1978); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citing *Parrat v. Taylor*, 451 U.S. 527, 537 n. 3, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 (3d Cir. 1976)). If *respondeat superior* were the only theory of liability alleged, summary judgment for the individual Defendants would be appropriate as a matter of law.

The Amended Complaint, however, also alleges that certain Defendants are personally liable in their individual capacities. AC ¶¶ 10-16. A supervisor may be held liable under Section 1983 if that supervisor was "involved personally, meaning through personal direction or actual knowledge and acquiescence, in the wrongs alleged." *McKenna v. City of Philadelphia*, 582 F.3d 447, 460 (3d Cir. 2009) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). The record contains specific allegations against Defendants Yatauro, Campos, Gilgallon, Mungro, Anderson, Daye, and Byrd. Therefore, a Section 1983 claim against these Defendants is not barred as a matter of law for lack of an allegation of personal involvement. Those specific constitutional claims, to the extent they allege personal involvement, are discussed below.

### 4. Merits of the Constitutional claims

In this section, "Defendants" refers to the individual Defendants in their individual capacities.

#### a. First Amendment claim (Count 1)

Plaintiff alleges that the Defendants retaliated against her for exercising her "First Amendment rights to air her grievances, bring attention to the ongoing misconduct at their residence and essentially question the wrongful acts and motives" behind the Defendants' actions. AC ¶ 37. First Amendment

retaliation claims are actionable, even without an adverse effect on employment, where the alleged retaliatory conduct would "deter a person of ordinary firmness from exercising her First Amendment rights." *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citing *McKee v. Hart*, 436 F.3d 165, 170 (3d. Cir. 2006)).

To succeed on this retaliation claim, the Plaintiff must show (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising her constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action. *Id.* (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir.2003)). Further, a government employee asserting such a claim against her employer must show that she spoke as a citizen on a matter of public concern. *Borough of Duryea, Pa. v. Guarnieri*, 131 S. Ct. 2488, 2493, 2500 (2011) (holding that this test applies in both speech clause and petition clause cases). If an employee does not speak as a citizen, or address a public concern, a Section 1983 action is not the appropriate forum to review a personnel decision taken by the employer. *Id.*

Here, even with the facts viewed in the light most favorable to the nonmoving party, *Scott v. Harris*, 550 U.S. 372, 380 (2007), the proofs present no First Amendment issue for trial. The record shows numerous employment grievances and EED complaints made by the Plaintiff. It also contains evidence of several actions taken by her DOC employers that could be viewed as "retaliatory" in the ordinary, colloquial sense. For example, after Plaintiff filed complaints about needing assistance in Center Control, she was suspended for five days for not completing her duties. That suspension was vacated at a disciplinary appeal and the charge was dismissed. *See supra*, p. 29. Plaintiff also alleges that in 2007, she was removed from her post after submitting an EED complaint. She filed a grievance, and Plaintiff's supervisors were ordered to return her to her post. *See supra* p. 24.

What is missing as to most of these allegations is any showing that Plaintiff's grievances or complaints were matters of public concern protected under the First Amendment. Speech involves matters of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Lane v. Franks et al.*, --S.Ct.--, 2014 WL 2765285 at *9 (2014) (citing *Snyder v.*

*Phelps*, 562 U.S. --, -- (2011) (slip op. at 6-7)). The court's inquiry focuses on the "content, form, and context of the speech." *Id.*

Plaintiffs' complaints concern workplace grievances; they do not present matters of public concern. *See Borough of Duryea*, 131 S. Ct. at 2493, 2500. The grievances, typified by the two examples described above, were ordinary workplace complaints regarding assignments, personnel disputes, and the like. Complaints of that kind are not communications to the public about matters of public concern. *Id.* at 2501 (noting that internal employee grievance procedures will generally not seek to communicate to public or to advance a political or social point of view).

True, Plaintiff also made complaints of gender and race discrimination. Such complaints may under some circumstances present matters of public concern. *Montone v. City of Jersey City*, 709 F.3d 181, 193 (3d Cir. 2013); *Azarro v. Cnty. of Allegheny*, 110 F.3d 968, 978-980 (3d Cir. 1997) (en banc) (holding that gender discrimination practiced by those exercising authority in the name of public official is matter of public concern). Not all discrimination complaints made by a public employee, however, qualify as matters of public concern; an examination of "all surrounding circumstances" is required to make that determination. *Id.* at 193-94. Plaintiff's discrimination allegations overwhelmingly describe instances where she believed she was targeted by the Defendants, sometimes because of her gender or race, and other times because of personal animus or her objections to prison policy. For the most part, they consist of ordinary workplace matters and complaints, but Plaintiff adds the allegation that, were it not for her sex or race, they would have turned out differently. With the exception of her "third-party harassment" complaint, none of Plaintiff's formal or informal complaints challenged widespread discriminatory practices or discriminatory conduct sanctioned or overlooked by prison supervisors or administrators.

What emerges from this complicated welter of allegations is that Plaintiff did indeed assert a limited number of discrimination-based grievances. As to some of these, I may even assume *arguendo* that they presented matters of public concern. But these particular gender-based complaints are not alleged to have been followed by retaliatory acts.[24]

---

[24]   *See infra* pp. 47-55 (in context of Title VII claim). For example, Plaintiff alleges that Defendant Sherrer suggested she stop filing complaints and told her that he could not help her if she went outside the internal review process. *See supra* pp. 25-26.

Count 1 primarily presents, not a First Amendment retaliation claim, but an ordinary case of workplace grievances. The record contains no issue of material fact regarding retaliation for protected First Amendment conduct. Summary judgment will be entered in favor of the Defendants on Count 1.

### b. Fourth Amendment claim (Count 2)

Plaintiff claims that she was "unlawfully seized" when she was subjected to unwanted sexual advances from Defendants whom she does not, for the most part, identify. Am Compl. ¶ 40. The Fourth Amendment, applicable to the states through the Fourteenth Amendment, *Wolf v. Colorado*, 338 U.S. 24, 27-28 (1949), protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. Plaintiff offers no authority for the proposition that there is a Fourth Amendment cause of action for unwanted sexual advances in the employment context.[25] This count fails as a matter of law.

### c. Fifth and Fourteenth Amendment due process claims (Counts 3 and 4)

Plaintiff alleges that she was deprived of her property—a privately owned firearm—without due process of law, in violation of the Fifth and Fourteenth Amendments. AC ¶¶ 43, 46. She invokes both the procedural and substantive dimensions of due process. *Id.* ¶ 46.

The standard for assessing a substantive due process violation is whether the Defendants' conduct amounted to an abuse that "shocked the conscience." Def. Br. B at 20 (citing *Fagan v. City of Vineland*, 22 F.3d 1296, 1303 (3d Cir. 1994) (en banc)); Opp. at 26-27. For a procedural due process claim, Plaintiff must show that the deprivation was not preceded by sufficient pre-deprivation process, and that the state did not offer a meaningful post-deprivation remedy. *Hudson v. Palmer*, 468 U.S. 517, 532-33 (1984) (holding that even intentional deprivations of property by state employees acting under

---

Plaintiff does not allege, however, that Sherrer or any other Defendant took any retaliatory action when Plaintiff *did* go outside the prison to file a civil action.

[25]   As discussed elsewhere, Plaintiff's allegations of sexual advances (against Defendants Anderson, Sherrer, and Byrd) are problematic in any event. *See e.g.* pp. 11, 14-16, 25-26 *supra* and discussion pp. 47-55 *infra* (in context of discrimination claims).

color of state law do not violate due process if the state affords a meaningful post-deprivation remedy).

Plaintiff alleges that her personal weapon was taken from her by Officer Sloan on February 23, 2007[26] without her permission and without a hearing, and that it was not returned to her "for a while."[27] DSMF Ex. C, Pl. Dep. at 74-75. She claims that Officer Sloan tampered with the gun while it was out of her custody. Opp. at 28. Plaintiff filed a grievance on March 12, 2007, requesting an explanation and chain of custody report. DSMF Ex. SS, Grievance 3/12/2007.

Whatever factual disputes may exist are not material. There is ample evidence of what occurred. Plaintiff merely posits, without evidence, that it all remains unexplained.

Viewing the facts most favorably to the Plaintiff, the temporary loss of her weapon did not violate either procedural or substantive due process. On February 23, 2007, Plaintiff signed her weapon into the Lobby Control Point ("LCP"). DSMF Ex. C, Pl. Dep. 75. During the day, Plaintiff was transported to the hospital for emergency medical treatment. She therefore did not retrieve her weapon from the LCP at the end of her work day. The LCP logbook for that day indicates that Sergeant Sloan removed Plaintiff's weapon from the LCP at 6:00 pm.[28] RSMF Ex. 60, Log Book 2/23/2007. The weapon was not "taken" from Plaintiff; it was retained by those to whom she had entrusted it, and moved to a different location for safekeeping after she, for understandable reasons, failed to retrieve it. After Plaintiff filed a grievance, she received a memorandum from Defendant Yatauro informing her of the location of the weapon and telling her that she could pick it up. DSMF Ex. UU, Yatauro Memo to Pl. 4/20/2007. True, Plaintiff did not actually know where the weapon was located until she asked. But there is no evidence in the record that she tried and failed to retrieve the weapon, or that Defendants denied access to it.

---

[26]    This was the date of Plaintiff's removal from her post, and the start of a two month leave of absence. *See supra* pp. 24-25.

[27]    Plaintiff attempts to amend this claim in her Opposition by asserting that the deprivation of due process included the removal of Plaintiff from her post and "banning" her from the prison on the same date, prior to her going to the hospital. Opp. at 27. These additional allegations were not pleaded in her Complaint.

[28]    Plaintiff claims the gun was signed back in at 10:00 pm by Sergeant Sloan, but the log book does not reflect that. RSMF Ex. 60, Log Book 2/23/2007.

There is no evidentiary support for Plaintiff's claim that Defendants took Plaintiff's property or prevented her from retrieving it in any substantial way. Still less did the removal of the weapon from LCP constitute conduct that "shocked the conscience" or deprived Plaintiff of due process. The storage of Plaintiff's weapon when she unexpectedly left work for medical reasons was at most an inconvenience. Summary judgment is awarded to Defendants on Counts 3 and 4.

### d. Selective enforcement (Count 10)

Plaintiff alleges that she was "selectively targeted for discipline and forced to endure harsher working conditions" because she refused to acquiesce in the unlawful demands of the Defendants. AC ¶ 68. The precise nature of this claim is somewhat difficult to discern. I will measure Plaintiff's claim against the standards of the case she cites, *Hill v. City of Scranton*, 411 F.3d 118 (3d Cir. 2005). Under *Hill*, a Section 1983 selective enforcement claim arises where there is discriminatory enforcement of an ordinance or law. *Id.* at 125. To establish a selective enforcement claim, the plaintiff must demonstrate (1) that other similarly situated violators of the ordinance or law were treated differently, and (2) that this disparate treatment was based on an "unjustifiable standard, such as race, or religion, or some other arbitrary factor, ... or to prevent the exercise of a fundamental right." *Id.* (quoting *Holder v. City of Allentown*, 987 F.2d 188, 197 (3d Cir.1993)).

Plaintiff claims that she has been treated differently because of her gender. That claim of disparate treatment depends to some degree on her claims elsewhere that Defendants acted wrongfully. She asserts that she has been disciplined unfairly, "set up and accused of things she did not do," given the "worst" assignments and no assistance, and retaliated against for writing reports against male officers. Opp. at 56. There are a multitude of allegations in this vein; some of them contain the requisite details, or have evidentiary support beyond the Plaintiff's bare assertions. On at least two occasions, for example, Plaintiff was victorious in that discipline was found to be unwarranted, and was rescinded.[29] On at least these two occasions, and perhaps others, Plaintiff's argument that she was unfairly targeted may possess some grounding in the evidence. Defendants assert in rebuttal that the

---

[29]   *See supra* pp. 25, 29 discussing (1) the May 2007 Grievance Hearing ordering that Plaintiff be returned to her post after two months' leave because no disciplinary action as pending, and (2) the April 2008 reversal of Plaintiff's five-day suspension for neglecting duties where Hearing Officer found that Plaintiff had requested assistance.

occasional reversal of disciplinary sanctions is an example of the system functioning as it should. Plaintiff regularly exercised her right to air grievances, and sometimes prevailed. *Id.* That evidence is not so one-sided, however, as to preclude a jury finding that Plaintiff was "treated … differently" from other officers at Northern State Prison. Def. Br. 2 at 45. On that narrow ground, I would not award summary judgment.

What the record lacks, however, is support for the assertion that any arguably disparate treatment was motivated by gender. Plaintiff, to be plain about it, has taken a number of garden-variety workplace complaints and added the bare assertion that the culprits were motivated by gender bias. Here, as elsewhere, I observe the distinction between specific allegations of discrimination and bald, unsupported assertions. *See e.g. Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 467 (3d Cir. 1989) (Garth, concurring); *Bailey v. Reading Housing Authority*, 187 Fed. App'x 148, 149 (3d Cir. 2006) (not precedential) (affirming summary judgment for defendant); *Haefner v. North Cornwall Twp.*, 40 Fed. App'x 656, 658 (3d Cir. 2002) (not precedential).

Even accepting that the Defendants were less than consistent in their application of policy, I do not see evidence that this occurred because of Plaintiff's gender. None of the numerous EED investigations and internal grievance procedures cited in the record resulted in a finding of gender-based discrimination. There is no evidence, other than Plaintiff's unsupported and general statements, of any specific case in which, for example, a similarly situated male officer who brought a similar grievance was treated differently. No evidence, other than Plaintiff's statements that the result would have been different if she were not a woman, has been proffered.

Plaintiff has failed to meet her burden to present specific facts showing a genuine issue for trial. *See Matsushita Elec. Indus. Company v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-461 (3d Cir. 1989). Summary judgment is granted as to Count 10.

### e. Monell liability (Count 11)

The Amended Complaint contains a separate count alleging "Monell" liability. AC ¶¶ 72-73. Plaintiff asserts that Defendants have a "pattern, practice and custom to violate rights of employees" by disregarding discrimination, ignoring the "rampant occurrences" of sexual and personal

relationships, failing to take corrective action, and tolerating the acts alleged in the complaint. *Id.* AC ¶ 72.

Count 10 is at best superfluous. *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 98 S. Ct. 2018 (1978), holds that a municipality cannot be held vicariously liable via *respondeat superior,* but that the required level of responsibility can be found in a custom or pattern of violations. It is not, strictly speaking, a cause of action, but a means of finding a municipality secondarily liable for the unconstitutional acts of its personnel.

The applicability of *Monell* to this case is not shown. DOC is the only defendant that is an institutional, governmental, or collective entity. DOC, however, is protected against Section 1983 claims by sovereign immunity. *See* p. 35-36, *supra.* The individual defendants concededly would be liable, not via *respondeat superior,* but only for their personal involvement in the constitutional violations alleged. *See* p. 38 *supra.*

Plaintiff does not identify any way in which *Monell* affords her an additional avenue of recourse against the particular Defendants named in this action. Summary judgment will be granted as to Count 11.

### f.  Section 1981 claim (Count 6)

Plaintiff asserts a separate claim pursuant to 42 U.S.C. § 1981 against all Defendants. There is no right of action against state actors under that statute. *McGovern v. City of Philadelphia*, 554 F.3d 114, 120-21 (3d Cir. 2009) (holding that the 1991 amendment of Section 1981 did not overrule *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 735-36, 109 S. Ct. 2702 (1989)). Such Constitutional claims against state actors are properly brought, if anywhere, under Section 1983. Summary judgment is therefore granted as to Count 6.

### g.  Conspiracy  (Count 8)

Plaintiff separately claims that the Defendants conspired with each other to orchestrate harassment that resulted in the violation of her constitutional rights. AC ¶ 62. The Amended Complaint does not specify a statutory basis, but Plaintiff's Opposition Brief indicates that this claim is brought under Section 1983. Opp. at 48. Section 1983 does *not* provide a cause of action *per se* for a mere agreement to deprive someone of a constitutional right; there can be no liability under Section 1983 without an actual deprivation. *See Sweetman v. Borough of Norristown*, 554 F. App'x 86, 90 (3d Cir. 2014) (not

45

precedential); *DeFeo v. Sill*, 810 F. Supp. 648, 658 (E.D. Pa. 1993) (*citing Kaplan v. Clear Lake City Water Authority*, 794 F.2d 1059, 1065 (5th Cir. 1986); *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir. 1980)); *Andree v. Ashland Cnty.*, 818 F.2d 1306, 1311 (7th Cir. 1987). Here, Plaintiff's underlying constitutional claims do not survive. Therefore, Plaintiff's conspiracy claim under Section 1983 fails as a matter of law.

Plaintiff has not alleged a claim under 42 U.S.C. § 1985. *See* Opp. at 48 (discussing Section 1983 only). If she had, it would fail. Section 1985 provides a cause of action for the victim of a conspiracy motivated by race or gender discrimination. *Farber v. City of Paterson*, 440 F.3d 131, 138 (3d Cir. 2006). To support a Section 1985 claim, the plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828-29, 103 S. Ct. 3352, 3356, 77 L. Ed. 2d 1049 (1983). The discriminatory animus required in the second element must be "class-based invidiously discriminatory animus," meaning that the purpose and effect of a violation is to prevent the victim from enjoying "equality of rights as contrasted with his and other citizens' rights." *Farber*, 440 F.3d at 135.

And, as discussed in more detail in the context of the employment discrimination claims, pp. 47-55, *infra,* the record does not support a finding of gender or race based discrimination. Plaintiff cannot point to any evidence that Defendants were motivated by an animus against female officers, or African-American officers. In fact, Plaintiff appears often to complain that she was treated differently from officers who were themselves African-American and female.[30] Section 1985 was not intended to provide a federal remedy for all tortious conspiracies, or to be a "general federal tort law." *Farber*, 440 F.3d at 135 (quoting *Griffin et al. v. Breckenridge et al.*, 403 U.S. 88, 101-02 (1971)). The deficiencies in Plaintiff's constitutional claims are not cured by the separate conspiracy count in the Amended Complaint.

---

[30]   For instance, Plaintiff alleges that other African-American female officer recruits were given preferential treatment by Defendant Mungro. DSMF Ex. AA, EED Decision 2/1/2007 at 2. She also alleges that Latina and Latino officers working in the Locator position were given preferential treatment during their shifts. DSMF Ex. C, Pl. Dep. at 89.

In short, the Constitutional claims are dismissed on summary judgment, particularly against the individual defendants in their individual capacities.

## C. Employment Discrimination Claims Under Title VII and the LAD

### 1. Title VII claim (Count 5)

Count 5 of the complaint asserts a claim pursuant to Title VII of the Civil Rights Act. For the reasons stated in subsection (a), *infra,* these Title VII claims are not properly asserted against the individual defendants, but only against Plaintiff's employer, DOC. Plaintiff primarily alleges that DOC retaliated against her because of her complaints of gender-based discrimination and because she did not respond to sexual advances by her superiors. AC ¶¶ 49-51. From her catchall allegations, however, the Court can also glean that she claims to have been denied equal opportunities, alleges that male officers have been treated more favorably, and complains that she has been given the "worse assignments." Opp. at 39. I will attempt to address those more general discrimination claims, even as I focus on what appears to be the primary claim, that of Title VII retaliation.

#### a. *Title VII claim against individual Defendants*

Plaintiff cannot maintain a Title VII claim against the individual Defendants, her co-employees. Def. Br. A at 15. Title VII imposes liability on an "employer," defined as "a person engaged in an industry affecting commerce who has fifteen or more employees ... and any agent of such a person." *Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1077 (3d Cir. 1996) (quoting 42 U.S.C. § 2000(e)-2(a)). It might be argued that such an "agent" could be the plaintiff's co-employee. But the Third Circuit, like a clear majority of courts, has held that there is no individual liability under Title VII. *Id.* at 1077-78.

Count 5 therefore fails at the outset as to the individual Defendants, and it will be dismissed as against them. The remainder of the discussion analyzes the elements of a Title VII claim as against Defendant DOC only.

#### b. *Prima facie retaliation case against DOC*

Plaintiff's Title VII retaliation claim against the DOC is subject to the three-step burden-shifting inquiry laid out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). *See*

*Scheidemantle v. Slippery Rock University State Sys. of Higher Educ.*, 470 F.3d 535, 539 (2006) (citing *McDonnell Douglas*). If the employee establishes a prima facie case, the burden then shifts to the employer to advance a "legitimate, non-retaliatory reason" for its conduct. *Id.* at 342. If the employer does that, the burden then shifts back to the plaintiff, who must convince the fact-finder that the employer's proffered "reason" is false, and that the real reason for the adverse employment action was retaliation. *Id.* (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir.1997). To defeat summary judgment, the plaintiff must produce some evidence from which a jury could reasonably reach these conclusions. *Id.* (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994)).

The plaintiff's threshold *McDonnell* showing of a prima facie case of retaliation comprises three elements: (1) Plaintiff engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006) (applying *McDonnell Douglas* framework in retaliation case).

As to the first element of a prima facie case, there are two classes of "protected activity": (a) participation (which includes formal charges, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII) and (b) opposition (encompassing informal grievance procedures, informal protests, and making complaints to management about acts unlawful under Title VII). *See Moore*, 461 F.3d at 341, 343; *Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.*, 450 F.3d 130, 135 (3d Cir. 2006). The employee plaintiff must have had an "objectively reasonable belief" that the challenged practice of the employer is unlawful under Title VII. *Moore*, 461 F.3d at 341 (citing *Clark County v. Breeden*, 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam)). Further, the plaintiff's opposition to discrimination must not have been equivocal. *Id.*

The second, "adverse action" element of a prima facie case is measured from the point of view of a reasonable employee. The retaliatory action must have risen to a level that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Moore*, 461 F. 3d at 341 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)).

The third element of a prima facie case requires a causal connection between the first two. *Id.* at 342. Causation requires a showing of "what harassment, if any, a reasonable jury could link to a retaliatory animus." *Id.* (citing *Jensen v. Potter*, 435 F.3d 444, 449-50 (3d Cir. 2006)).

To state a prima facie case of Title VII retaliation is not an onerous burden, *see Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253 (1981), but Plaintiff has failed to carry that burden here. The Amended Complaint seemingly aims to establish a pattern[31] of retaliation for protected activity. Plaintiff generally alleges that DOC disregarded and failed to take corrective action regarding her complaints of "pervasive discrimination" at Northern State Prison, including sexual relationships between superiors and subordinates. AC ¶ 72.

Plaintiff's allegations encompass retaliation for the following EED complaints lodged by her:

1. In 2003, Plaintiff filed an EED complaint regarding an allegedly discriminatory mail policy instituted by Defendant Byrd, and a metal detector search of the Plaintiff around the same time. The policy and search pre-dated the filing of the EED complaint.
2. In 2005, she filed another EED complaint regarding the mail policy. The EED decision indicated that Plaintiff admitted that her complaint was not gender-based, but that she believed she was retaliated against for complaining about the policy.
3. In late 2006/early 2007, Plaintiff made several EED complaints regarding the staffing of Center Control with female CO recruits, and for "third party sexual harassment" of those recruits.[32] After Plaintiff filed those complaints, two female recruits filed an EED complaint against Plaintiff alleging that she used inappropriate language towards them.
4. In February of 2007, Plaintiff was removed from her post. Defendants assert it was because of an altercation with a recruit (one of those

---

[31]    Plaintiff's summary judgment opposition and Responsive Statement of Facts do not expressly set out a pattern; however, she alleges numerous incidents as evidence of such discrimination. The incidents recited in the Parties' statements of facts are listed here in rough chronological order.

[32]    Plaintiff could not identify any specific relationships or instances of sexual harassment by Defendant Mungro. DSMF Ex. AA, EED Decision 2/1/2007 at 2.

who filed the EED complaint against Plaintiff). Plaintiff asserts that it was related to her own (unspecified) EED complaint.

5. In November 2007, Plaintiff filed a Special Report against her supervisors for failing to provide her with assistance when she was acting as Center Control Locator. She was then charged with neglecting her duties and suspended for five days. In response, Plaintiff filed grievances and EED complaints. After a disciplinary appeal hearing, the suspension was reversed and the charge was dropped.

6. Plaintiff generally alleges that, in retaliation for her filing of EED complaints, Defendant Stokes, as hearing officer in disciplinary hearings, failed to adequately investigate her complaints and decided matters against her.

Recall that Plaintiff's claim is one of retaliation for engaging in protected Title VII activity. The filing of an EED complaint *can* qualify as protected activity if it relates to the concerns of Title VII. *See Curay–Cramer*, 450 F.3d at 135 (recognizing formal EEOC complaints, as well as informal complaints to management, qualify as protected activity for purposes of a retaliation claim). But setting aside the sexual harassment complaint (*see* ¶ 3, above, discussed further below), Plaintiff's EED complaints bear no relation to gender or other discrimination addressed by Title VII. Nor were they even alleged as discrimination claims.[33]

For example, Plaintiff's mail-related complaints were not motivated by reasonably perceived gender discrimination against Plaintiff. Plaintiff's 2003 EED complaint regarding the metal detector search[34] and the change in mail policy did not reasonably allege gender or race discrimination. Plaintiff complained because she did not believe that sorting mail properly lay within her job duties. DSMF Ex. C, Pl. Dep. at 27-28. The EED decision made no finding of gender or racial discrimination. Moreover, it pointed out that the mail

---

[33]    Plaintiff more generally alleges, however, that the *denial* of these complaints would not have occurred but for gender-based (or *Holland* consent decree-based) discrimination.

[34]    Plaintiff asserted that Byrd targeted her for security screening because her brother had recently been fired, and because Byrd wanted to date her. Ex. II, Investigation Report 7/16/2003 at 2-3. Those allegations, standing alone, do not establish a Title VII violation. There is no specific evidence that male workers, for example, were not screened in this way, or that the detection device somehow was programmed to respond on a biased basis.

policy applied to *all* employees and that *all* employees were subject to search by metal detector when they reported to work. DSMF Ex. EE, EED Decision 9/9/2003. At any rate, Plaintiff alleges no retaliatory act that followed the filing of that 2003 complaint. *See id.* The second, 2005 EED complaint was also based on the mail policy, not gender discrimination. Plaintiff herself told the investigator that the alleged "retaliation" arose, not from gender discrimination, but from her challenge to the mail policy. DSMF Ex. O, EED Decision 5/10/2005.

Plaintiff's EED complaint regarding Defendants' failure to give her assistance while she was working as a second shift locator is likewise an insufficient predicate for a Title VII retaliation claim. Plaintiff herself asserted that she believed that she was being discriminated against, not because of gender or race, but because she worked the second shift (the first and third shifts received assistance). DSMF Ex. WW, Grievance #1 11/27/2007 (containing no allegation of gender or race based discrimination). Plaintiff later added a bare allegation that she was treated differently based on her gender and status as a beneficiary of the *Holland* consent decree. *See* DSMF Ex. NN, EED Investigation Report 4/9/2008. But there are no underlying facts (such as, for example, the gender composition of the other shifts) that would tend to support that assertion. Witnesses interviewed in the EED investigation included female officers who attested they were never denied assistance. Even assuming that the locator on the second shift was denied assistance, Plaintiff's complaint does not satisfy the first element of retaliation claim. Discriminatory treatment based on policy or personnel matters, even if wrongful for some other reason, is not protected activity under Title VII. *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995) (complaint about general unfair treatment and dissatisfaction that someone else was awarded a position did not constitute protected activity).

The two remaining retaliation allegations in the record also fail to establish a basis for the claim. Plaintiff alleges that she was removed from her post in 2007 because of an EED complaint, but she alleges no discriminatory conduct related to the incident.[35] *See* DSMF ¶ 71 (citing Ex. C, Pl. Dep. at 114).

---

[35]   Plaintiff also alleges that the removal in 2007 was because "she was not a willing participant in the escapades that took place at Northern State Prison." RSMF ¶ 275. No evidentiary support is put forth for this statement. Plaintiff states that she was removed despite there being no disciplinary charge against her or investigation conducted, but she does not provide any support or reasoning for what she believed to be the real reason for her removal.

Finally, Plaintiff's general allegation that Defendant Stokes, as hearing officer, retaliated against her by failing to adequately investigate her complaints and by repeatedly deciding against her is not sufficient to create a prima facie case of retaliation. Stokes was not involved with any EED complaints that Plaintiff filed. RSMF Ex. 41, Stoke Dep. at 41-43. Plaintiff cites no statements by Stokes or anyone else to the effect that the EED complaints played any role in his decisions. Stokes merely acted as the Hearing Officer for three of the disciplinary hearings discussed above. His decisions do not suggest any pattern of discrimination: one was wholly in Plaintiff's favor, one was largely favorable to Plaintiff, and one denied a grievance regarding work assignments of recruits because prison policy allowed such assignments.[36] In short, there is no substantial evidence of actionable Title VII retaliation by Stokes, whether based on the filing of EED complaints or anything else.

As noted above, one of Plaintiff's EED complaints are at least facially implicates Title VII concerns. I refer to the sexual harassment complaint described at p. 49, ¶3, *supra*. The only alleged retaliatory act, however, was the filing of an EED complaint against Plaintiff by two female recruits who worked in Center Control. If done or directed by Plaintiff's employer, that could conceivably have been a material adverse action. But there is no evidence that these two recruits filed their complaint at the direction of the employer. Plaintiff says so, but she submits no evidence, and alleges no facts; her unsupported belief that the employer must have done so is not evidence. Without a showing that the DOC was liable for the recruits' conduct, Plaintiff cannot establish a prima facie case of Title VII retaliation. *Moore v. City of Philadelphia*, 461 F.3d 331, 349 (3d Cir. 2006) (when co-workers are the perpetrators of the harassment, the plaintiff must prove employer liability using traditional agency principles).

---

[36]     On July 21, 2005, Plaintiff appeared at Disciplinary Appeal Hearing for a five-day suspension imposed for failure to sort the mail. Stokes found in favor of prison Management, but lowered the recommended penalty from five days to one. DSMF Ex. FF, Disciplinary Appeal Hrg. 7/21/2005. Stokes presided over a May 3, 2007 grievance hearing concerning Plaintiff's complaint about officer recruits working in Center Control. Stokes denied the grievance because prison policy allowed recruits to work for training or to assist senior officers. DSMF Ex. CC, Grievance Hrg. 5/3/2007. Finally, Stokes found in favor of Plaintiff at an April 16, 2008 Minor Disciplinary Hearing for a charge of neglect of duties as Center Control Locator. Stokes' decision noted that there was no evidence that Plaintiff neglected her duties, and that she had requested assistance. He dismissed the charge in its entirety. DSMF Ex. AAA, Minor Disciplinary Hrg. 4/16/2008.

Even if we look beyond the formal EED complaint, the record does not support Plaintiff's claim that supervisory employees at the DOC were responsible for harassment or discriminatory treatment of her. Plaintiff's numerous allegations that Defendants Gilgallon, Campos, Mungro, Sherrer, and Yatauro conspired against her because she was a female officer or a beneficiary of the *Holland* consent order are not meaningfully supported by specific allegations, let alone facts.[37]

In sum, despite the numerous allegations of discrimination in the record, Plaintiff has failed to establish a prima facie case of retaliation.

### c.  Gender discrimination

Plaintiff's claim in Count 5 may also be interpreted as a straightforward gender discrimination claim (as opposed to a retaliation claim).[38] For that reason, I briefly discuss it, although the same burden shifting analysis applies and the relevant considerations are similar. The prima facie elements of a Title VII discrimination claim are: (1) the plaintiff is a member of a protected class; (2) she was qualified for the position she sought to attain or retain;[39] (3) she suffered an adverse employment action; and (4) the action occurred under

---

[37]    In addition to the formal complaints cited above, Plaintiff makes several other allegations potentially relevant to her Title VII retaliation claim. She alleges that male corrections officers passed around a sexually explicit video. RSMF ¶ 334. Plaintiff does not indicate that she made any formal or informal complaint, and she does not allege any retaliation in connection with it. Plaintiff's statement of material facts also contains an allegation that Defendant Daye "at one point asked to see her vagina," *id,* but this statement is not cited to the record. No evidence of this incident (beyond Plaintiff's assertion in this pleading) is in evidence. And as to both incidents, there is no evidence in the record indicating that Plaintiff "opposed" the conduct within the meaning of Title VII, or suffered any consequences as a result. *Curay-Cramer*, 450 F.3d at 135 (noting that opposition must identify the employer and the practice). In these instances, it is not clear what, if any, complaint or protest Plaintiff made before filing this lawsuit, and there is no factual allegation of retaliation for such a complaint or protest.

[38]    Plaintiff's EEOC charge is limited to a gender discrimination claim; therefore she is also limited to asserting gender-based discrimination here. *See* DSMF Ex. RR, EEOC Charge 8/22/2008; 42 U.S.C. § 2000e-5(f)(1).

[39]    The Pretrial Order entered by Judge Hochberg specifically prohibits Plaintiff from asserting failure to promote as a basis for a gender discrimination claim. Order (Docket No. 108) at 7.

circumstances that could give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

The record does not contain sufficient evidence to defeat DOC's motion for summary judgment on a gender discrimination claim. Plaintiff has failed to establish the last two elements of the prima facie case: that she suffered an adverse employment action, and that the surrounding circumstances give rise to an inference of discrimination. Plaintiff alleges several "adverse actions": that she was given "worse" assignments; that she was denied assistance while working as a locator on the second shift and disciplined for failing to complete her work; that she was disciplined for being late when other male officers were not; that she was not given the same training as male officers; and that she was given a worse work schedule.[40] Opp. at 39.

The evidence that Plaintiff presents in support of these allegations carries no inference of discrimination because it does not plausibly suggest that discriminatory intent, rather than some other factor, motivated the adverse actions.[41] *Bartos v. MHM Corr. Servs.*, 454 F. App'x 74, 77 (3d Cir. 2011) (not precedential) (affirming summary judgment for defendant on this basis). While the record contains evidence of garden-variety employment complaints, it does not support a finding of discriminatory intent.

As discussed above, Plaintiff's allegation that she was denied assistance as locator are not gender-based; she essentially claims that she was treated differently because she worked on the second shift. Her allegations regarding lateness were made in the same context. She asserts that the second shift was issued a lineup requirement by Defendant Gilgallon and that officers on other shifts were not subject to the same treatment. RSMF ¶ 238; DSMF ¶ 40. *See also* DSMF Ex. V, Grievance Hearing 5/3/2007 (denying grievance). Plaintiff's complaint that she, unlike another officer (also female), was required to fill out late slips also does not provide evidence of discriminatory animus—it, too, was

---

[40]    Plaintiff's allegations regarding being given worse assignments and schedules are asserted in her statement of material facts, but do not appear anywhere else in the record.

[41]    I assume for purposes of discussion that at least some of the actions Plaintiff alleges would constitute materially "adverse" employment actions. *See Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006) (adverse employment action is one that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee").

related to the lineup requirement for the second shift and not to Plaintiff's gender. DSMF Ex. W, Grievance Hearing 5/22/2007 (finding that the officers who failed to appear at lineup were given late slips). As for her other allegations, Plaintiff states, but cites no evidence of record, that male officers were given better positions or schedules. She also cites no evidence that male officers were given better training opportunities.[42] Plaintiff's conclusory contentions that these incidents were gender-based are insufficient to raise an inference of discriminatory action.

As with Plaintiff's retaliation claim, there is not evidence in the record sufficient to support a prima facie case of Title VII gender discrimination by DOC. Summary judgment is granted for the Defendants as to Count 5, the Title VII claim.

## 2. LAD Retaliation Claim (Count 7)

Plaintiff brings a separate state-law claim for retaliation pursuant to the New Jersey LAD. AC ¶ 57; Letter (Docket No. 140).[43] She asserts that she was retaliated against, denied overtime and choice workstations, and harassed after attempting to redress defendants' wrongdoing by disclosing information to her supervisors, the EEOC, and the New Jersey ED. *Id.* ¶¶ 58-59.

### a. *Statute of limitations*

Defendants argue that Plaintiff's claims under the LAD for events occurring before March 4, 2009, are time-barred. Def. Br. A at 7. The statute of limitations under the LAD is two years. *Montells v. Haynes*, 627 A.2d 654, 133 N.J. 282 (1993). Under the "continuing violation doctrine," however, a plaintiff may pursue a claim for discriminatory conduct "if he or she can demonstrate that each asserted act by a defendant is part of a pattern and at least one of those acts occurred within the statutory limitations period." *Ivan v. Cnty. of*

---

[42]    Plaintiff does allege that Latina officers were given training opportunities when African-American officers were not. RSMF ¶ 284. This allegation of race discrimination is not otherwise supported in the record.

[43]    The Amended Complaint alleged this Count as arising under the LAD, the Conscientious Employee Protection Act (CEPA) or the New Jersey Civil Rights Act. Plaintiff was prohibited from pursuing both claims because CEPA requires that a party seeking relief under its terms waives the right to pursue remedies under other laws based on the same facts. May 2, 2011 Order (Docket No. 125). In a letter dated May 14, 2011, Plaintiff's counsel informed the Court that Plaintiff would pursue her state law retaliation claim under the LAD. Letter (Docket No. 140).

*Middlesex*, 595 F. Supp. 2d 425, 448 (D.N.J. 2009) (citing *Shepherd v. Hunterdon Developmental Ctr.*, 174 N.J. 1, 6–7, 803 A.2d 611 (2002); *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754–55 (3d Cir. 1995)). Where there is a "continual, cumulative pattern of tortious conduct," the statute does not start running until the wrongful action ceases. *Shepherd*, 174 N.J. at 18. The acts must constitute an ongoing pattern; plaintiff must show more than just "isolated or sporadic" incidents of harassment. *Bolinger v. Bell Atl.*, 330 N.J. Super. 300, 307, 749 A.2d 857 (App. Div. 2000); *Beck v. Tribert*, 312 N.J. Super. 335, 346, 711 A.2d 951 (App. Div. 1998).

Plaintiff's allegations are sufficient to meet this standard, at least for purposes of summary judgment. As in the case of her Section 1983 claims, the record would permit a fact finder to find that the incidents alleged were continuous and interrelated, so that they constituted a pattern that satisfies a "continuing violation" theory as to DOC, the overarching organizational defendant that employed the individual actors. Such a pattern might be more difficult to establish as to individual defendants, but, for the reasons expressed below, I find that only DOC is a proper defendant here. I therefore will not further analyze the statute of limitations with respect to the LAD claims.

### b. *Prima facie case of LAD retaliation*

A LAD claim follows the same *McDonnell Douglas* burden-shifting analysis as the Title VII claim discussed above. First the Plaintiff must establish a prima facie case of discriminatory retaliation. To do so, Plaintiff must demonstrate that: (1) she engaged in a protected activity known by the employer; (2) she suffered an adverse employment action; and (3) her participation in the protected activity caused the retaliation. *Craig v. Suburban Cablevision, Inc.*, 140 N.J. 623, 629-30, 660 A.2d 505, 508 (1995). A LAD Plaintiff bears the burden of providing that her original complaint (that triggered the retaliation) was made reasonably and in good faith. *Carmona v. Resorts Int'l Hotel, Inc.*, 915 A.2d 518, 520, 189 N.J. 354 (2007). An unreasonable, frivolous, bad-faith, or unfounded complaint cannot satisfy the statutory perquisite to establish retaliation liability under the LAD. *Id.* at 530.

Once the Plaintiff has met her initial burden, the defendants must articulate a legitimate, non-retaliatory reason for the adverse action. *Young v. Hobart West Group*, 897 A.2d 1063, 1072-73, 385 N.J. Super. 448 (App. Div. 2005). Then, "the plaintiff must come forward with evidence of a discriminatory motive of the employer, and demonstrate that the legitimate reason was merely

56

a pretext for the underlying discriminatory motive." *Id.* at 1073 (internal quotation omitted).

The prima facie elements of an LAD retaliation claim mirror those of a Title VII retaliation claim. *See Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001); *Delli Santi v. CAN Ins. Companies*, 88 F.3d 192, 198 (3d Cir. 1996). In addition, the allegations underlying Plaintiff's LAD claim are no different from those relevant to her Title VII retaliation claim. Having found no factual basis to establish adverse employment action following a protected activity under Title VII,[44] I apply similar reasoning to Plaintiff's LAD claim. *See id.* at 263-64 (analyzing Title VII and LAD hostile work environment and retaliation claims together and granting summary judgment for defendants on retaliation claim). Defendants' motion for summary judgment is granted as to Count 7.

### c. *Individual liability*

LAD, like Title VII, imposes liability on employers, not individual co-workers. A supervisor or other employee is not an employer under LAD. *Cicchetti v. Morris Cnty. Sheriff's Office*, 947 A.2d 626, 645 (N.J. 2008). The liability of such an individual can arise only through "the aiding and abetting" mechanism of the LAD statute. *Id.* To prove an employee liable as an aider or abettor, Plaintiff must show (1) the employer whom the defendant aided performed a wrongful act causing an injury; (2) the defendant was generally aware of his role as part of an overall illegal or tortious activity at the time that he provided the assistance; and (3) the defendant knowingly and substantially assisted the principal violation. *Id.*; *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 127 (3d Cir. 1999) (defining aiding and abetting liability).

I have found, however, that DOC is not liable. Without the predicate liability of the employer, there is no basis to impose aiding and abetting liability upon the individual Defendants. The individual Defendants' motion for summary judgment as to Count 7 is granted on this ground as well.

---

[44]    Unlike a Title VII claim, an LAD claim does not explicitly distinguish between opposition and participation activity. *Quinlan v. Curtiss-Wright Corp.*, 8 A.3d 209, 268, 204 N.J. 239 (2010). The conduct alleged by Plaintiff, however, failed to qualify as either, so the distinction makes no substantive difference.

## III.   CONCLUSION

The Defendants have carried their burden pursuant to Fed. R. Civ. P. 56 of showing that there is no genuine dispute of material facts as to any of the eleven causes of action alleged in the Amended Complaint. Accordingly, summary judgment is appropriate on all counts and will be entered in favor of the Defendants.

An appropriate order will be entered in accordance with this Opinion.

Dated:  June 24, 2014

**Hon. Kevin McNulty**
**United States District Judge**

58